(No. 21972.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRISON PARKER, Plaintiff in Error.

*Opinion filed February 23, 1934.*

Louis N. Blumenthal, and Charles Vlach, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, and Grenville Beardsley, of counsel,) for the People.

Mr. Justice Herrick delivered the opinion of the court:

On the third day of January, 1931, the plaintiff in error was indicted in the criminal court of Cook county charged in the first count of the indictment with larceny as bailee, in the second count with embezzlement and in the third

count with larceny. A jury was waived and the cause tried before the court. At the conclusion of the case the court excluded all evidence of alleged acts of embezzlement prior to January 27, 1928, except where connected up with the evidence of embezzlement subsequent to January 27, 1928. The State's attorney elected to stand on the embezzlement count. The court found the defendant guilty of the embezzlement of $100,000, as charged in the second count, and judgment was entered on such finding. The cause comes here on writ of error sued out of this court by the defendant.

The count upon which the defendant was found guilty charged that he, as agent in the employ of the North American Trust Company, (formerly named Iroquois Trust Company,) embezzled the sum of $349,000 which had been delivered to and had come into his possession and was in his care by virtue of such employment.

The record is voluminous, consisting of over 3200 pages. It will serve no useful purpose to undertake to set out in this opinion all of the facts as disclosed by the evidence.

The case revolves about two corporations, one known as the Guaranteed Reserve System (hereinafter referred to as the Reserve System) and the other as the North American Trust Company, formerly the Iroquois Trust Company (hereinafter referred to as the trust company). The Iroquois Trust Company was incorporated on the ninth day of May, 1921, with its principal office in Evanston, with a total capital stock of $50,000 common stock, consisting of 500 shares of the par value of $100. The defendant had no connection with the Iroquois Trust Company at the time of its organization. The original incorporators disposed of their stock in the company in the early part of 1926. On March 24, 1926, the capital stock of the trust company was increased to $250,000. On April 16, 1926, the capital structure was again changed, the capital being increased from $250,000 to $2,000,000, consisting

of 20,000 shares of six per cent cumulative preferred stock of the par value of $100 each, and 80,000 shares of common stock of no par value. This certificate of the increase was executed by George W. Sheehan as secretary. On May 4, 1927, the corporate purpose was amended and a certificate was duly filed as provided by law, stating the corporate objects of the trust company as follows: "To accept and execute trusts, to carry on a general trust company business in all its branches, and to buy, sell and otherwise deal in stocks, bonds, notes, mortgages and other securities." This certificate was signed by John J. Bailey as vice-president. On May 6, 1929, the corporate name of the Iroquois Trust Company was changed to North American Trust Company. The certificate of the change of the corporate name was also signed by Bailey as vice-president.

The activities of the trust company subsequent to April 15, 1926, seem to have been directed to a great extent to the sale of its capital stock, although some "trust funds" or "units" were sold. On April 15, 1926, the board of directors authorized the sale to the public of all unissued stock in units of eight preferred shares and twelve common shares at the price of $1100 per unit. The proceeds were directed to be credited on the company books, at the rate of $100 per share, to the preferred stock account, and at five dollars per share to the common stock account, and the balance to the surplus account. This ratio in the units of common and preferred stock, however, was not maintained at all times down to the return of the indictment. Later the number of common shares per unit was reduced from time to time, until latterly only six shares of common stock were included in each unit sold, although the selling price of the units remained the same.

The Guaranteed Reserve System was incorporated under the laws of the State of Delaware on May 26, 1924. It was purely a personal service corporation, without capi-

tal stock. The membership in the corporation was divided into two classes. The first class was composed of those individuals who should subscribe to the by-laws and who performed personal service in the administration of the corporate functions of the corporation. It was provided that this class of members should control the management of the company's affairs. The second class was composed of individuals, firms or corporations who by contract with each other desired to avail themselves of the personal services furnished by the Reserve System in the devising of plans, the preparing of contracts and the execution thereof. The original incorporators of the Reserve System were L. J. Lifka, George F. Ort and M. P. Lake, all of Chicago. The defendant, Parker, apparently owned and controlled the Reserve System, and he apparently was the dominating factor in the trust company from the spring of 1926 through 1930. Sheehan became connected with the trust company in 1926. Parker was elected director of the trust company at the annual meeting of the stockholders on January 10, 1927, and resigned on June 4, 1927. He was never thereafter identified with the trust company as an officer, director or otherwise until January 19, 1931, which was just twelve days before the return of the indictment in this case.

The Reserve System from its incorporation in 1924 until 1926 was exclusively engaged in perfecting plans for the raising of capital and for the sale of trust funds by trust companies. There was evidence tending to show that the Reserve System had spent $192,000 developing these plans. A part of the plans was copyrighted by the Reserve System. This plan was sold or transferred to the trust company on April 24, 1926, by written contract executed on that date by the trust company and the Reserve System. The contract provided that in consideration of the sale and transfer by the Reserve System to the trust company of the selling plan and copyright, the trust com-

pany would pay the Reserve System or its agent $220 for each unit of stock sold by the trust company. The trust company agreed to pay out of the $220 per unit to the Reserve System the sum of $165 to salesmen and to pay for developing the sales literature. Paragraphs 8, 9 and 10 of said contract provided as follows:

"VIII. The party of the first part [trust company] agrees to maintain on its books during the life of this agreement an account that shall be designated as the Guaranteed Reserve System account. The party of the first part agrees to credit the party of the second part [Reserve System] upon this account, from time to time, with the sum of $220 for each and every unit of stock sold, as hereinbefore provided, and also with the proceeds from the sale or conversion by the officers of the party of the first part of any securities owned or furnished by the party of the second part or its agents and deposited with the party of the first part as security for any moneys that may be advanced by the party of the first part to the party of the second part or its agents. This account will be debited with items presented by the party of the second part and approved by the officers of the party of the first part.

"IX. Should the party of the first part debit or credit this account, or charge the party of the second part with any items whatsoever, either with or without the written consent or approval of the party of the second part or its agents, then, before final settlement of said account or the payment of any notes that may have been given by the party of the second part shall be made, the party of the second part or its agents may dispute and refuse to admit any such debits, credits or charges.

"X. In event of a refusal of the party of the second part or its agents to admit any such items, such disputed item or items shall be submitted to a certified public accountant licensed to practice in the city of Chicago, Illinois, to be selected by the party of the first part and the party

of the second part. Such certified public accountant to whom such disputed items shall be submitted shall determine whether or not such items were legitimate and whether or not such items should or should not have been debited or credited or charged, as the case may be, to said account of the party of the second part, or whether they should not have been charged to the party of the first part. The party of the first part and the party of the second part hereby agree that at this time it cannot be determined what items should finally be debited or credited to the account of Guaranteed Reserve System."

Paragraph 11 provided that from any decision made by any certified public accountant either party might within thirty days appeal for arbitration to any circuit judge or superior court judge of Cook county, Illinois, or any master in chancery of the superior court or circuit court of Cook county, or to any former master in chancery of the superior or circuit court of Cook county selected by the parties to the contract.

The contract further provided that if the Reserve System or its agents from time to time might ask advances in anticipation of sales to be made or from the proceeds of securities sold or converted to its own account by the trust company, the trust company, before making any such advances, might demand additional security and a demand note endorsed by Harrison Parker; that as part payment for any money advanced to the party of the second part in anticipation of sales, the trust company might at all times convert to its own use and benefit any such collateral as it might hold as security for the payment of the account of the Reserve System at values that might be determined by the officers of the trust company, and any decision by the officers of the trust company as to the value of any securities at the time of their conversion by the trust company should be binding on both parties to the contract. The value as so determined should be credited to the account

of the Reserve System on the books of the trust company but in no event at a lower figure than the value at which the securities were accepted by it. The trust company reserved the right to cancel or modify any of the provisions of the contract in one year from the date thereof. It was further provided that the word "securities," as used within the contract, should include stocks, bonds, notes and other evidences of indebtedness and should include the preferred and non-par common stock of the trust company.

This agreement was on July 16, 1926, modified by a further written agreement which amended paragraph 8. By the amendment the Reserve System agreed that the trust company for its own convenience might credit the Reserve System on the Reserve System accounts with any items that the trust company might see fit to credit in addition to the items from the sale of the stock and proceeds from the sale or conversion of securities; that the trust company should debit the Reserve System from time to time with money advanced upon order of the Reserve System, and with $165, and no more, when paid to persons designated by the Reserve System as entitled to the same in the sale of stock. Until such time as the parties should execute an agreement providing for opening offices throughout the United States the trust company might charge the Reserve System with expense items or money which ordinarily might be charged to organization expenses. In the final settlement the trust company should credit the Reserve System and charge the regular corporate accounts for all items which may have been charged to the Reserve System without its written consent, except the money advanced directly by check to it or its officers or persons for developing literature. If a new agreement should be concluded for opening offices throughout the United States, all such items of organization expenses theretofore charged to the Reserve System should be paid by the Reserve System with seven per cent notes payable only out of com-

missions, which notes should be the sum of all debit balances charged to the Reserve System without its written consent. The contract of April 24, 1926, as modified by the contract of July 16, 1926, remained in force until April 4, 1930, at which time it was canceled by mutual agreement, with the express provision that such cancellation should not affect the transactions had prior to the date of cancellation. Shortly after the execution of the contract of April 26, accounts were opened on the books of the trust company, which accounts were designated as the "Guaranteed Reserve System accounts." These accounts were at all times carried upon the books of the trust company. Each of the contracts was offered in evidence by the People.

John J. Bailey was a director and vice-president of the trust company from January 10, 1927, until June 4, 1927. On that date he resigned. He was later, in January, 1928, re-elected as a director, and continued as a director until late in September, 1929, when he was removed as a director. He was elected vice-president in January, 1928, and served in that office until his removal as director in September, 1929, shortly before the filing of the bill in equity by the trust company against the Reserve System and the defendant, later discussed herein. At the annual stockholders' meeting in January, 1929, Bailey was also elected treasurer of the trust company. A. F. Mirrielees was at one time chief executive officer of the trust company. He resigned as such president in February, 1929, and thereupon Bailey became the chief executive officer of the company and served until his removal. He and Sheehan each owned one share of the common stock of the trust company.

George W. Sheehan was elected a director, secretary and treasurer of the trust company in April, 1926, and served in those offices until the annual meeting in January, 1927. He was re-elected as a director of the trust company and served as such until June, 1927, when he re-

signed. Prior to his connection with the trust company he had been a merchant. In 1927 he organized George W. Sheehan & Co., a corporation, of which he was the president and director. He owned fifty per cent of the stock of the company. Bailey owned about forty-nine per cent of such stock.

At the annual stockholders' meeting of the trust company held on January 10, 1927, a contract was authorized with Sheehan by which he was granted the exclusive right to sell any and all securities issued or sold by the trust company or in which it had any interest, including the monthly installment trust funds for the territory covered by the Seventh Federal Reserve District, for a period of twenty years. The resolution also appointed Sheehan as the agent of the trust company to sell its capital stock to the amount of $1,000,000, which was set aside for that purpose. For the sale of the stock he was to receive a commission of fifteen per cent whether the stock was sold for cash or on the installment plan. This contract was assigned to Sheehan & Co. Under this contract the evidence showed that Sheehan & Co. was paid by the trust company about $184,000 in commissions.

An amended and supplemental bill of particulars was filed by the prosecution setting forth a list of checks (and some few drafts) tabulated as to dates, drawees, payees and amounts. The period of time covered by the checks and drafts was from April 29, 1926, to and including December 11, 1929, the total being $192,375.49. The check with which the draft was purchased accompanied the draft. These exhibits were consecutively numbered from 1 to 411$d$, inclusive. The copies of the accounts taken from the books of the trust company were also attached and made a part of such bill of particulars. It was stipulated by the parties that every check listed in the amended and supplemental bill of particulars was executed by the persons whose signatures such check purported to bear on behalf of the

maker; that the persons who executed the same as officers of the trust company executed the check as the duly authorized officers of the trust company; that each and every check was entered upon the regular books of account of the trust company and also charged on said books against the account of the Reserve System; that all such checks were cleared in the regular course and paid by the banks, the canceled checks having been returned to and kept in the records of the trust company; that the endorsements appearing on the several checks were the genuine endorsements of the persons whose names were signed thereto, and that wherever the endorsement "Guaranteed Reserve System" appeared, such endorsement was written by the defendant. The stipulation was made without prejudice to any objection on the part of the defendant as to the competency, relevancy or other objection that might be interposed to such checks. These checks and drafts were all admitted in evidence.

A transaction strenuously attacked by the People was the defendant's transactions in the purchase by the trust company of the Illinois Valley Trust Company and the Sheridan Life Insurance Company (hereinafter called the life insurance company). The Illinois Valley Trust Company (hereinafter called the Valley Trust Company) and the life insurance company were acquired about the same time. The evidence shows that both these companies were acquired through the efforts of the defendant. There is no controversy about what the trust company paid for the stock of the life insurance company. The weight of the evidence shows that the trust company was to pay $65 per share for the stock of the life insurance company. There is a dispute as to what the trust company was to pay for the stock acquired by it in the Valley Trust Company. The prosecution claimed that the trust company was to pay a total of about $78,000 for the stock purchased. This amount represented approximately the advances claimed as

made to the Valley Trust Company by the Reserve System through advances in turn made to it by the trust company which represented the actual cost to the Reserve System, which stock gave the trust company a controlling interest in the Valley Trust Company, while the defendant claimed that the stock was to be paid for at $100 per share, which amounted to about $145,000 additional. A brief history of the transaction is given herein.

On the 30th day of June, 1928, the trust company acquired 2316½ shares of stock of the Valley Trust Company through the Reserve System. The entire capital stock of the Valley Trust Company was 2500 shares of the par value of $100 each. After acquiring 2316½ shares of the capital stock of the Valley Trust Company the trust company later acquired all of the capital stock of the Valley Trust Company excepting 63 shares which were held in trusts then being administered by the last named company. On the same day the trust company got the 2316½ shares it also acquired 288 shares of life insurance company stock from the Reserve System, and thereafter acquired 656 additional shares of stock in the life insurance company, which represented a controlling interest in that company. The stock of the Valley Trust Company and the life insurance company was after its acquirement carried as an investment or asset on the books of the trust company. This stock investment is shown as an asset of the trust company in the report hereinafter referred to, made by the auditing firm of Peat, Marwick, Mitchell & Co. dated October 17, 1930, and which audit was offered in evidence by the defendant. The same stock was shown as an asset or investment in the audit or report made for the year 1930 in his report of January 10, 1931, by Raymond S. Blunt, a certified public accountant. After the trust company acquired the controlling interest in the life insurance company and the Valley Trust Company, the trust company sold trust funds issued by and funded with

the Valley Trust Company which contained certain insurance features or benefits, the insurance features being written by the life insurance company. The defendant offered in evidence the plan of correlation, and the trust certificates issued pursuant thereto, which the evidence showed had been devised by him. Through Sheehan & Co. 798 trust estates or units of the Valley Trust Company, with a maturity value of $3,000,000, were sold by the trust company.

The evidence showed that Prof. Glover, who is a professor of mathematics in the University of Michigan, made the actuarial calculations in connection with the development of the sales of the trusts to be made by the Valley Trust Company as to the amount of money which the trust company could allocate during the year under the plan originated by the defendant. Prof. Glover determined the potential profits on these contracts over the contract period, as based on the first year's sales, at the sum of $248,147. On the 30th of June, 1928, entries were made in the books of the trust company indicating the acquisition of this stock in the Valley Trust Company and the life insurance company as an investment from the Reserve System for the trust company. On that day J. A. McDonnell, who was used as a medium in the acquiring of the stock in the two companies last named, was credited with $106,570, the journal entries indicating that 38 shares of the life insurance company stock were purchased at $65 per share and 1041 of the Valley Trust Company stock at $100 per share. The Reserve System notes receivable and interest account on the trust company's books were also credited in the sum of $145,360, indicating 1275½ shares of Valley Trust Company stock were purchased at $100 per share, 250 shares of life insurance company stock at $65 per share, and an Illinois Valley ten-year trust certificate for $1560, making a total of $145,360. These journal entries were made by Honecker, the comptroller, at the direction of Lifka, secretary of the trust company, pursuant to a reso-

lution of the board of directors of the trust company, at a meeting regularly called and held June 29, 1928.

The resolution mentioned authorized the directors to buy from McDonnell 1041 shares of Valley Trust Company stock at $100 per share and 38 shares of life insurance company stock at $65 per share, and also to buy from the Reserve System the remaining stock of the Valley Trust Company at $100 per share and as much of the stock of the life insurance company at $65 per share as could be acquired at that price. The record of this resolution was adopted at a meeting called pursuant to a ten-day notice in accordance with the by-laws. Lifka, Bailey, Mirrielees, Eckenfeld and Sykes were the directors present and voting at the meeting. Over the objection of the defendant, Bailey and Sheehan were permitted to testify that no such resolution had been adopted. Two other directors who the record showed were not present at the meeting were permitted to testify, over the objection of the defendant, that no such resolution was adopted. These last two witnesses testified that in February, 1928, there was a discussion before the board of directors at which time the defendant stated that the stock of the Valley Trust Company could be acquired for $75,000 to $100,000. The record of that meeting, however, offered in evidence by the People failed to show any discussion as to the subject matter of the acquisition of the stock of the Valley Trust Company. Mirrielees, who was an officer of both a State and National bank in Chicago, and who was president of the trust company at the time the resolution was adopted on June 29, testified for the People. He was not, however, questioned with reference to this resolution. Mirrielees was also put on the stand by the defendant as a witness. Mirrielees testified that he had an independent recollection of the adoption of the resolution of June 29 and that he presided at the meeting; that neither Parker nor anyone else asked him to vote for the resolution and

that he had not discussed it with Parker; that he did not call any meeting in February, 1928, concerning the advancement of any money for the acquisition of the stock of the Valley Trust Company. Lifka, who was secretary of the trust company at the time of the adoption of the resolution, was called by the defendant and testified that he (Lifka) had an independent recollection of the meeting of June 29 and of the discussion and the material points of the discussion that took place at and prior to the meeting; that Parker had not asked him to vote one way or the other, and that there had not been any meeting of the directors before June 29 at which any discussion took place in connection with the acquisition of the stock in the Valley Trust Company; that Bailey was the only one of the directors at that time really familiar with the transaction; that Bailey went to Peoria for the purpose of making the audit and made the recommendation that the trust company purchase the stock of the Valley Trust Company; that at the meeting of June 29 Bailey stated, in substance, that the Valley Trust Company stock was worth $100 per share and the life insurance company stock was worth $65 per share.

There is a direct and irreconcilable conflict between the evidence of the defendant and Bailey with reference to the details leading up to the acquisition by the trust company of the stock of the Valley Trust Company and the life insurance company. However, the evidence conclusively shows, in our judgment, that Parker, on behalf of the Reserve System, did acquire the stock of the Valley Trust Company and the life insurance company before the 29th day of June, 1928, through negotiations with the president and secretary-treasurer of the Valley Trust Company. Parker testified that in 1927 he informed Bailey, who was then an active officer of the trust company, of the situation, with the view of determining whether the trust company would be interested in acquiring the stock; that

thereupon Bailey, who testified in this case that he was a competent and experienced auditor, went to Peoria and made an examination of the Valley Trust Company. The defendant testified that after this examination was made, Bailey told Parker, in substance, that the trust company was not disposed to buy the stock at that time, the risk to the trust company being too great because of the precarious position of the Valley Trust Company due to frozen assets; that if the Reserve System acquired the stock of the Valley Trust Company pursuant to some arrangement whereby the Valley Trust Company would be relieved of its pressing liabilities, the trust company would take up the stock from the Reserve System. We believe from the evidence that Parker, rather than Bailey, is corroborated in his statement as to what actually took place.

Bailey, on cross-examination, while testifying as a witness for the People, stated that the stock of the Valley Trust Company was not shown as an asset of the trust company or carried in the stock and bond account before June 29, 1928. He further positively stated that such stock was never carried on the books as collateral security for the Reserve System note, and that the books of the trust company never referred to the stock in any manner whatever until June 30, 1928, his explanation being that these securities were "held in auditing abeyance." However, the record does show an entry upon the books of the trust company as of May 18, 1928, reciting that 1315½ shares of Valley Trust Company stock was held as collateral to a note of the Reserve System dated April 30, 1928. The evidence further shows that a large part of the funds used by Parker through the Reserve System to acquire the stocks of the two corporations, the Valley Trust Company and the life insurance company, and to discharge the pressing liabilities of the Valley Trust Company, were advanced by the trust company; that as advancements were made from time to time there was made and delivered to

and accepted by the trust company the promissory note, at seven per cent interest, of either McDonnell or the Reserve System for the amount of each respective advance, and that collateral in the way of stock of the trust company itself and stock of the Valley Trust Company was also deposited for an adequate amount as collateral security for each of the notes. The testimony further showed that by June, 1928, the obligations and liabilities which had impeded the acquisition by the trust company of the Valley Trust Company had been discharged and that the Reserve System was then in a position to deliver the stock to the trust company clear of the objections theretofore made by Bailey. The evidence showed different prices paid for the stock of the Valley Trust Company by the Reserve System, a few isolated shares being purchased at $200 per share. There is evidence in the record that at the time the stock of the Valley Trust Company was delivered to the trust company it was worth at least $100 per share and the stock of the life insurance company was worth at least $65 per share. The People offered no evidence whatever tending to contradict these values.

About the 29th of August, 1929, a violent quarrel broke out between Parker on the one side and Sheehan and Bailey on the other, the evidence tending to show that Parker accused Bailey and Sheehan of defrauding investors of the trust company. Parker demanded of Bailey that he resign as an officer and director of the trust company and make restitution of the money alleged to have been improperly obtained, threatening that unless he did so Parker would have Bailey removed as an officer and report his supposed improper acts to the authorities. There is in evidence a letter written about that time by Parker to the Secretary of State and others, stating that Sheehan & Co. had been selling securities; that the Secretary's office had refused to license the Sheehan company as broker to sell securities; that Parker's name had been connected more

or less with the concern, and that he was notifying the interested officials that he (Parker) had no interest in the concern and never had had, and that he was notifying them on the day that he learned the securities were being sold in violation of the Illinois Securities law. Charges of improper conduct were also made by Bailey and Sheehan against Parker. Following this break between Parker and Bailey and Sheehan, on the 31st day of August, 1929, C. E. Honecker, who was the auditor of the trust company, at the direction of Bailey caused entries to be made in the books of the trust company by which a charge was made against the Reserve System of $31,630.50, plus an item of interest in the sum of $2583.64 and a corresponding credit given to Sheehan & Co. in the total sum of $34,214.14. This charge and credit were purported to have been made by virtue of a letter written by Parker to Sheehan. This letter is not dated, so far as the record discloses, but the evidence tends to show that it had been written about two years before. The letter purported to tell Sheehan that Parker would give him three per cent of Parker's commission if Sheehan's monthly production exceeded 50 units. There was no evidence that the monthly production exceeded 50 units. Without deciding the merits of the controversy as to the correctness of this charge against the Reserve System we believe that the defendant was justified in objecting to the entry of this debit charge against the Reserve System.

Shortly after the break of August 29 several violent altercations ensued between Bailey and Sheehan on the one hand and Parker on the other. There is evidence tending to show that two of the directors offered to stand with Parker provided he would sign a note for $110,000 made by the Coöperative Society of America, with which society the defendant had at one time been connected. This note was a supposed asset of the trust company but had no value. The evidence shows that there had been, thereto-

fore, litigation over Parker's liability on this note and he had been found not liable. The feeling between Sheehan and Bailey on the one hand and Parker on the other became increasingly bitter and intense. The evidence showed that after the quarrel arose, Bailey and Sheehan raised a fund of about $12,000 or more by solicitation of the stockholders of the trust company to carry on litigation against Parker. Bailey is an experienced accountant. The names of Bailey and Honecker, together with those of Marguerite Quesse and Rachel Jackson, were the only names of witnesses endorsed upon the indictment. Marguerite Quesse and Rachel Jackson were not called as witnesses by the People. Bailey had prepared an audit of the books of the trust company, the accuracy and correctness of which he testified to on the trial and which was admitted in evidence over the objection of the defendant. The evidence showed Bailey's name, as an officer of the trust company, signed to a great many of the checks which were issued to the Reserve System and which were in controversy in this case.

In September, 1929, Bailey, allegedly acting on behalf of the trust company and in its name, caused to be filed a bill, verified by him, in the circuit court of Cook county against Parker and the Reserve System. This suit had a three-fold purpose, as follows: (1) Questioning the right of Parker to vote 50,000 shares of stock in the trust company, on the theory that the stock had not been properly paid for; (2) seeking an accounting from Parker charging that he had appropriated large sums of money from the trust company for his own purpose; and (3) praying for the appointment of a receiver for the trust company. Other bills of complaint were filed and various supplemental bills, amendments and other pleadings in the litigation, all tending to accomplish the same object. The causes were consolidated and referred to Julius H. Miner, one of the masters in chancery of the Cook county circuit court, upon

a limited order of reference, which did not include the taking of an accounting. The evidence showed that the master suggested that the defendant, together with McDonnell and B. B. Bradshaw, the latter of whom had been president of the trust company, select two directors, the Bailey-Sheehan faction select two directors, and that the four directors select a fifth impartial director of recognized ability and unquestioned integrity. Pursuant to this suggestion a meeting was held in the master's office and B. J. Cramer and Earl R. Davis were elected as directors to represent the Parker interests, and John J. Bailey and John W. Beckwith, the latter being the attorney for Bailey and Sheehan and also having been at one time director of the trust company, to represent the Bailey-Sheehan interests. The master selected Edward Hanson as a fifth director from the other stockholders. The selection of the five directors was agreed upon and confirmed by all of the interested parties. After their selection the five directors last named elected Hanson president, Cramer secretary, Davis treasurer and Bailey vice-president. At a directors' meeting these five directors unanimously decided that the books of the trust company should be immediately audited by a responsible firm of certified public accountants. Bailey suggested the name of Peat, Marwick, Mitchell & Co., and this firm was, without opposition, selected by all the directors to make the audit.

The evidence showed that this audit involved a review of the transactions of the trust company from the time of its organization to January 31, 1930, and a special analysis and examination of the accounts of the Reserve System, beginning in 1926 and ending with January 31, 1930. Some nine months were occupied in making the audit. The evidence showed that the separate engagement involving the accounts of the Reserve System was occasioned by a dispute of the various items in that account. The contract provided that the Reserve System had a right to have these

items reviewed before a final settlement. A preliminary analysis was made of the account of the Reserve System. It was then shown to Parker, Bailey, Bradshaw, Lifka and Hanson. The representatives of the accountants also consulted with the representatives of the trust company. Parker contended that the Bailey-Sheehan faction, which had been in charge of the trust company books, had erroneously and improperly charged the Reserve System account with numerous charges that were not debts of the Reserve System but were corporate charges against the trust company, and he also disputed many of the debit items or charges to the Reserve System. The accountants thereupon suggested that the board of directors should appoint a committee to investigate the disputed items. Pursuant to this recommendation the board of directors appointed a committee of its members, consisting of Bradshaw, who was president of the trust company in 1926 and familiar with its affairs at that time, Lifka and Hanson. This committee was directed to report its recommendations as to the disposition of the disputed items. Lifka testified that each member of the committee except Hanson spent considerable time in the accountants' office, carefully checking each individual item and searching for bills, vouchers and other memoranda in order to trace each check. Unless it was possible to verify the fact that a check had been improperly charged the committee did not recommend the reversal of such item. The accountant superintending the work testified that there were canceled checks in every case to indicate the reason for the reversal of a disputed item, except where entries were represented by journal vouchers and those vouchers were available to support the reversal entry, and that no charge was reversed without some original documentary verification to indicate the necessity therefor. Numerous items disputed by Parker on behalf of the Reserve System were not reversed by reason of the provision contained in the contract of July 16, 1926, which

provided in the final settlement that the trust company would credit the Reserve System and charge the regular corporate accounts for all items that might have been charged to the Reserve System without its written consent, except moneys advanced directly by check to it or its officers. As a result of this examination and conference with the committee, the amount of over-charges to the account of the Reserve System disclosed by the auditing company's special report on the Reserve System account aggregated $166,776.60, which amount was thereupon reversed on the trust company's books in favor of the Reserve System.

After this committee had completed its investigation of the accounts of the trust company and the Reserve System it submitted to the directors of the trust company a written report which in detail and at great length went into the committee's activities. There were attached to this report the work sheets, explanatory exhibits and recommendations to the auditing company, together with sixteen exhibits. These exhibits separately itemized each disputed debit indicated for reversal, by check number, payee, date and the amount of the original charge, and classified the same according to the proper corporate account as made by the audit. The report of the committee was approved at a meeting of the directors of the trust company on June 9, 1930, and pursuant thereto the items or debits therein recommended for reversal were reversed as charges against the Reserve System and charged to the proper corporate accounts of the trust company in accordance with the audit. The resolution recited the committee had been appointed to meet with Parker and the Reserve System to effect a settlement of their differences and had arrived at an equitable adjustment of their respective differences thereto. The committee had recommended to the directors of the trust company various adjustments in the books of the corporation in order accurately to reflect the transactions of the corporation with the Reserve System, Parker and others.

280

The report recommended that, upon its acceptance by Parker and the Reserve System, it stand as the correct and true state of accounts between the trust company, the Reserve System and Parker. The record showed that such report . was accepted by Parker for himself and as president of the Reserve System.

R. S. Blunt, a certified public accountant, audited the books for the trust company for the year 1930. The audit of the trust company's books showed as of December 31, 1930, that there was an account receivable to the trust company from the Reserve System for $4789.42 and a contingent account payable to the Reserve System of $7804, and that the trust company was indebted to Parker in the sum of $2290.79. The closing of this audit was just a few days prior to the indictment returned against Parker.

Bailey testified as a witness for the People that he had made an audit of the books of the North American Trust Company. He disregarded in his audit the reversals authorized by the committee and the board of directors of the trust company. An examination of his audit showed the Reserve System charged with certain items which he, if at all cognizant of the affairs of the trust company, must have known were not properly chargeable to the Reserve System. He testified that he was employed by the State's attorney's office in the capacity of bank examiner and bank auditor, and had been so employed from the latter part of April or the first part of May, 1931. The evidence shows that he has been very active in the preparation of the case against the defendant.

On March 7, 1932, a decree was rendered in the consolidated chancery cause by the circuit court of Cook county. A certified copy of this decree was offered in evidence on the part of the defendant. This decree, amongst other things, found that the contract made between Sheehan and the trust company had been assigned to Sheehan & Co., and that Sheehan & Co. had made gross commissions in

the selling of stock of approximately $184,000; that the defendant had lawfully acquired the 50,000 shares of stock in the trust company and that he was the owner thereof in the month of December, 1931. The decree makes reference to the controversy between Sheehan and Bailey and the defendant; to two of the directors who had offered to go along with the defendant if he would execute a note for $110,000 antedated to a time when he had been a trustee of the Coöperative Society of America, which note, if executed, would have afforded them an opportunity to bind the Coöperative Society of America and enabled them to recover such amounts from the society, and that the defendant had refused to execute such note. The court further found that said two directors and Bailey each owned one share of the common stock of the trust company of the value of five dollars per share, and that the real interest of Bailey and Sheehan in the litigation had been not as stockholders or on behalf of the stockholders, but their interest in the litigation had been to force a disputed liability of Sheehan & Co. upon the North American Trust Company, and that the real interest of the other two directors had not been that of stockholders or on behalf of stockholders, but that their activities have been the result of the refusal of Parker to execute the $110,000 note, which note if executed would have been a fraud upon the Coöperative Society of America; that an audit of the books of the trust company had been made by Peat, Marwick, Mitchell & Co., certified public accountants of integrity and high standing, and an accounting had been made; that the accounting was duly and properly had between the trust company and Parker and the Reserve System, and that it appeared from such accounting that Parker was not then indebted or in any way liable to the North American Trust Company, but, on the contrary, the trust company was indebted to Parker in the sum of approximately $3000; that the Reserve System was not indebted to the trust company,

but, on the contrary, the trust company was indebted to the Reserve System; that Bailey and Sheehan had collected approximately $12,000 from the stockholders for the purpose of prosecuting such proceeding, and that in the name of the complainant stockholders Bailey and Sheehan were endeavoring in the litigation to procure for Sheehan & Co. a sum of money stated in the pleadings to be approximately $50,000, based upon disputed credits theretofore mentioned in the decree, and that the suit was not prosecuted in good faith.

Numerous errors are assigned upon the record which challenge the rulings of the trial court upon the admission and exclusion of evidence, as well as others attacking the sufficiency of the indictment and raising numerous questions as to the correctness of the judgment pronounced against the defendant.

The vital question presented at the very inception of the review of this case is whether any of the transactions proved can be sustained as constituting embezzlement. The resolving of this question in the negative renders unnecessary a decision of any of the other points raised. In order to establish embezzlement the People must prove, beyond a reasonable doubt, four distinct propositions or elements of fact: (1) That the accused was the agent of the principal or corporation, and that he by the terms of his employment was charged with receiving the money or property of his principal; (2) that he did come into possession of the property; (3) that he received it in due course of his employment; and (4) that he, knowing that the property was not his, converted it to his own use or the use of another who is not the true owner. Underhill on Crim. Evidence, (3d ed.) sec. 445; *People* v. *Cobler,* 108 Cal. 538, 41 Pac. 401.

A great portion of the evidence centers about the alleged failure of the Reserve System to open offices for the sale of the securities of the trust company in twelve cities. On

behalf of the State it is claimed (1) that there was an agreement on the part of the Reserve System to establish twelve offices in twelve different States in the United States for the purpose of selling the securities of the trust company; (2) that $125,000 was to be advanced to Parker for this purpose; and (3) that this sum was advanced for this specific purpose. There is no evidence that any specific sums were advanced for the purpose of opening such twelve offices. The evidence showed that if any such advance had been made, the Reserve System had the right to have the amount charged to it or could give its own note endorsed by Parker.

On January 10, 1927, at the annual meeting of the stockholders of the trust company a resolution was adopted authorizing the directors to advance to the Reserve System for opening twelve selling offices, $125,000 upon its seven per cent note, endorsed by Parker, any amount so advanced to be re-paid by March 3, 1928, at the rate of two per cent per month on all sales of stock made by the Reserve System or its assigns, until the entire amount of interest should be re-paid. On the same date the directors passed a motion authorizing the officers of the trust company, as soon as the certificate of authority had been received from the Auditor of Public Accounts, to enter into a contract with the Reserve System as outlined at the stockholders' meeting, and to advance to the Reserve System upon the note endorsed by Parker any sums up to $125,000. Only four offices were ever opened. Great stress is laid by the People upon this resolution. It is contended by the prosecution that by reason of having moneys advanced to him, and by virtue of this resolution that twelve offices were to be opened by the Reserve System, the defendant is guilty of embezzlement. It does not necessarily follow that any of the checks issued were upon the faith of this resolution. The action of the directors shows that they expected a contract to be executed before they acted upon the reso-

lution by advancing money for the purposes embodied in the resolution of the stockholders. The evidence in the case conclusively shows that no contract was ever executed between the defendant and the trust company for the opening of the twelve offices as contemplated by the resolution, and there is not a scintilla of evidence in the record justifying the conclusion that any moneys drawn by the Reserve System were in pursuance of the terms of such resolution. The resolution and the motion did not amount to a contract. The most that can be said of them is that they were merely proposals to enter into a contract. This is accentuated by the terms of the contract of July 16, which shows an abandonment of the scheme to open twelve offices but contemplates that offices might be opened generally over the United States if the parties agree to that plan. There is nothing in the evidence warranting the legal inference that any of the moneys so advanced were advanced by virtue of such resolution. It must have been known to the executive officers of the trust company that any funds loaned to the Reserve System were not being loaned for the purpose of opening the twelve offices mentioned in such resolution. The account of the Reserve System introduced in evidence by the People was practically day by day transactions covering a period of almost four years, and the checks from No. 157 to No. 411 covered a period of about two years. The checks were not drawn to the Reserve System alone but to divers and sundry payees, and many of the checks were drawn for small accounts. Both Sheehan and Bailey signed a great many of these checks as officers of the trust company. Bailey for quite a considerable period of time was the chief executive officer of the trust company and signed checks for the company over a period of practically two years. These officers must have known that twelve offices were not being opened or any attempt being made to open them for the sale of securities of the trust company, and that none of

the checks which they signed on behalf of the trust company were advancements for that purpose. The bill of particulars and the amended and supplemental bill filed herein were drawn with great care and skill. There is no charge in the amended or supplemental bill of particulars that any of the checks, or the proceeds thereof, were obtained by the defendant for the ostensible purpose of opening twelve offices for the sale of securities of the trust company. Where a bill of particulars has been filed, the consideration of the case against the defendant must be limited to the charges as stated in the bill of particulars. (*Township of Lovington* v. *Adkins,* 232 Ill. 510; *McDonald* v. *People,* 126 id. 150.) The transactions between the trust company and the Reserve System and the defendant completely negatived the thought that any of the checks in question were delivered to the Reserve System or to the defendant for the specific purpose of opening twelve selling offices.

The crime of embezzlement differs from that of larceny in that in embezzlement the original taking is lawful, as the party acquires the possession of the funds or property by reason of the relation of principal and agent or employee. The *gravamen* of the offense consists of the subsequent conversion of the property so received with the felonious intent on the part of the agent or employee to convert the property to his own use. The crime of embezzlement is not established by showing that an unsettled account exists between the principal and agent. The People must further prove, beyond all reasonable doubt, that the agent converted the property to his own use with the felonious intent to deprive the owner of the property or its use. (*State* v. *Culver,* 97 N. W. (Neb.) 1015.) The mere proof of the receipt of funds and the failure to account therefor is not sufficient, in itself, to show embezzlement by an agent or employee. There must be proof of

felonious and fraudulent conversion. (*People* v. *Davis*, 269 Ill. 256; *People* v. *Ervin*, 342 id. 421.) The evidence must establish, beyond all reasonable doubt, that the defendant feloniously and fraudulently converted to his own use or took and secreted with intent so to do, without the consent of his principal, the money or property in question in order to justify a conviction for embezzlement. (*McElroy* v. *People*, 202 Ill. 473; *Ross & Co.* v. *Innis*, 35 id. 487.) The acts of the defendant may be acts of maladministration and indifference to the interests of his principal and subject him to severe censure, or he may be guilty of a breach of trust, but unless the evidence proves that he feloniously converted the property to his own use or took and secreted the same with intent so to do, without the consent of his principal, a conviction for embezzlement cannot be sustained. (*United States* v. *Britton*, 108 U. S. 193, 27 L. ed. 701.) The evidence in the case shows that the defendant did not flee, and that there was no effort on his part to conceal the amount of funds drawn from the trust company by the Reserve System or the purposes for which any of the funds were used, but he at all times claimed the right to such advancements. Embezzlement involves secrecy and the concealment by the defendant of his conversion. The absence of such proof is a circumstance which tends to negative the charge that the defendant was actuated by a felonious intent. *State* v. *Jones*, 25 Ida. 587, 138 Pac. 1116; 20 Corpus Juris, 436.

The contract contemplated advances would be made from time to time, as might be required, to the Reserve System by the trust company. It also foresaw that disputes and controversies might arise as to moneys paid and advanced and credits claimed under the contract, and if such occasions arose the contract provided the method by which such controversies should be settled, in providing for an audit of the books by a certified public accountant and the right to appeal by either party from the accountant's

findings. The contract had been in existence for some three years at the time this controversy arose. The annual statements were prepared from the books of the company and reports made to the Auditor of Public Accounts during this period of time. The amount owing to the trust company by the Reserve. System, if there was any such amount, must necessarily have entered into these annual statements. If there are any doubtful terms in the contract, the construction put upon them by the parties themselves will be followed by the court where the construction of such doubtful terms or conditions comes before the court for interpretation. (*McLean County Coal Co.* v. *City of Bloomington,* 234 Ill. 90; *Wright* v. *Loring,* 351 id. 584.) Regardless of what may have been the merits of the claim made by the defendant as to his lawful right to receive the moneys advanced to the Reserve System and to use and retain such moneys, still the transactions he had were open. There was no element of secrecy or concealment on the part of the defendant. He at all times claimed the right to have, receive and hold such funds. Such claim, made in good faith, completely negatives the idea of fraudulent and felonious intent, which is a necessary element of embezzlement. (2 Bishop on Crim. Law, (9th ed.) par. 379; *People* v. *Galland,* 55 Mich. 628.) Even if the claim of the defendant was ill-founded or without merit, yet where the right to the property was asserted in good faith and such right was based upon reasonable grounds, the conversion of any checks or moneys received would not constitute embezzlement, for the reason that the element of felonious intent is wanting. *Ridge* v. *State,* 192 Ind. 639, 137 N. E. 758; *Brown* v. *State,* 92 Fla. 538, 109 So. 438; *State* v. *Hurley,* 234 S. W. (Mo.) 820; *Dunavant* v. *Commonwealth,* 144 Ky. 210, 137 S. W. 1051; *State* v. *Culver, supra; State* v. *Wallick,* 87 Iowa, 369, 54 N. W. 246; *Wyatt* v. *State,* 21 Okla. Crim. 121, 205 Pac. 194; 2 Bishop on Crim. Law, (9th ed.) sec. 379.

In the consideration of the case we cannot ignore the decree in the case of North American Trust Company *vs.* Harrison Parker *et al.* The original suit in which the decree was rendered was filed long before the present indictment was returned. An accounting was demanded by the bill in behalf of the trust company from the Reserve System and the defendant. A certified public accountant was employed, this apparently under the provisions of paragraph 9 of the contract of June 26. The books were audited, the account stated and no appeal prosecuted from the accountant's findings. The circuit court of Cook county proceeded to a hearing in that cause and rendered a final decree during the pendency of the case at bar against the defendant. That decree is in full force and effect. The circuit court had jurisdiction of the parties and the subject matter, and the very checks itemized in the bill of particulars filed in this cause were necessarily involved in the chancery case. That decree specifically found that the Reserve System was not indebted to the North American Trust Company and the defendant was not indebted to the trust company, but, on the contrary, the trust company was indebted both to the Reserve System and to the defendant. That decree cannot be attacked collaterally in this proceeding. It is conclusive as to the matters adjudicated by the decree, one of which adjudications was the very accounts in issue in the proceeding here. Whether there is any civil liability on the part of the defendant to the trust company is not before us, but only the issue as to whether the acts proved against him establish embezzlement on his part, as charged in the indictment.

We have given all the evidence in the record careful consideration. After such review of the evidence we are unable to find any sufficient foundation upon which to base a conviction for embezzlement.

The judgment of the criminal court is reversed.

*Judgment reversed.*