(No. 23157.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES C. PENTIS, Plaintiff in Error.

*Opinion filed December 19, 1935—Rehearing denied Feb. 6, 1936.*

CHARLES CENTER CASE, and RAYMOND CANADAY, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and RICHARD H. DEVINE, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

James C. Pentis has sued out this writ of error to review a judgment of the criminal court of Cook county which was based upon a jury verdict finding him guilty of embezzlement under section 80 of the Criminal Code.

In 1932 Pentis was the treasurer of the village of Brookfield. For some years prior to that time he had been cashier of David A. Noyes & Co., dealers in stocks and bonds. In January, 1932, he terminated this employment and started a brokerage business of his own, specializing somewhat in municipal securities. He operated out of the office of Noyes & Co., with which firm he had a trading account and a line of credit up to $5000. The gist of the charge laid against him by the People was that he used funds of the village of Brookfield to purchase certain of its special assessment bonds for himself. His profit came about by using those funds, according to the People, to buy such bonds at a discount and then redeem them at full face value, plus the accrued interest. The difference between the price paid and the redemption price represented the profit accruing to Pentis by this sort of transaction. Pentis, on the other hand, frankly admitted that he bought the bonds in question, but insisted that he had a right, such as any other broker would have, to buy the bonds at the best price attainable, and that they became his property before the purchase prices therefor had been paid to the various vendors. It was, and is, his theory that the checks he wrote as village treasurer on the special assessment funds constituted a redemption payment to him as the *bona fide* legal holder and owner of all the property rights in the bonds involved. The incidents of each transaction whereby the bonds came into his hands, the payments therefor and

the manner of their redemption are evidenced by numerous instrumental exhibits.

Pentis first contends that the village of Brookfield did not have title to the special assessment funds, or did not have a special interest therein sufficient to support the charge that he embezzled funds of the village. We can not subscribe to this contention. We have heretofore held that only a special interest in property is necessary on which to base an indictment for burglary and larceny or for operating a confidence game. *People* v. *Fitzgerald,* 297 Ill. 264; *People* v. *Golub,* 333 id. 554.

Pentis questions whether his acts amount to an embezzlement. This compels us to state the pertinent steps in each of the bond deals.

The bill of particulars which the People were required to furnish, showed that they relied upon certain alleged fraudulent conversions. The first was charged to have happened on March 8, 1932, and involved six bonds from two special assessments, having a total face value of $5400. They were the property of the receiver of a closed bank in Moline and he wished to get rid of them. An officer of an open bank in the same city undertook to dispose of them. This officer, Engstrom, contacted Pentis in October, 1931, while the latter was still an employee of Noyes & Co. Near January 1, 1932, a price of $65 per $100 was agreed upon, and Pentis directed Engstrom to send the bonds "direct to David A. Noyes with specific instructions as to how you want them paid." Engstrom wrote to Noyes, in care of Pentis, to deposit the proceeds to the credit of Engstrom's bank at the Central Trust of Chicago. The bonds were received by mail at Noyes' office and delivered to Pentis on March 7, 1932. He first obtained a check from Noyes & Co. for $3672, the price of the bonds, then he delivered this check to the Central Republic Bank, with instructions to wire the Engstrom bank in Moline that amount. On the same day Pentis drew a check as village

treasurer on the special assessment funds for $4166.40, payable to the Central Republic Bank, with which he purchased a cashier's check payable to Noyes & Co. This last amount was allocated to four of the bonds which were of the same special assessment, and those bonds were canceled. The check given to Noyes & Co. was credited to his trading account, which at the time had a debit balance against him of $205. To take care of the two remaining bonds of this transaction Pentis on the next day wrote a check against the special assessment fund for $1618.12, payable to Noyes & Co. On this he received from that company a credit on his account of $618.12 and $1000 in currency. The difference between the amount paid for the six bonds and the amount paid out by Pentis, as village treasurer, to redeem them was $2115.52. This amount was claimed by Pentis as profit on the transaction rather than an embezzlement, as the bonds were redeemable at par, $100, regardless of the amount paid by the holder who bought them.

The second item of the bill, dated May 23, 1932, concerned a $1000 bond of the village which was held by the Engstrom bank in Moline as part of a trust fund. Pentis knew that the bank held this bond and procured it for $700. It was forwarded by Engstrom directly to Pentis in care of Noyes & Co., with directions concerning how the purchase price was to be remitted—*i. e.*, by crediting the account of the Engstrom bank in the Central Republic Bank and Trust Company. The testimony of Pentis shows he received this bond at the office of Noyes & Co. on February 26, 1932, and the check of that firm for $700 was obtained by him, payable to the Central Republic Bank and Trust Company, and was charged against him in his trading account, which at that time did not carry a credit in his favor. This check was turned over to the payee bank and it transmitted $700 to the Engstrom bank. On the same day Pentis drew $600 from the special assessment fund by check as village treasurer, payable to the Central

Republic Bank and Trust Company. Adding to this sufficient funds of his own, he procured a cashier's check from that bank payable to Noyes & Co. That firm, on receipt of the amount, credited Pentis' trading account with $700. Pentis then credited on the special assessment account of this particular bond the $600 part payment thereof. Some time later he sold this particular bond and then bought it back on May 23, 1932. The same day he redeemed this bond by drawing a check as village treasurer on the special assessment fund for $418.08, which represented the remaining principal and the interest thereon. This check was made out to the Central Republic Bank and Trust Company and was used to purchase two cashier's checks, one for $280 in favor of the party who had owned the bond and one for $135.08 to himself. The difference between the redemption amount, plus the interest thereon, and the price paid to the Engstrom bank, is $315.08, which the People allege Pentis embezzled from the village.

The third item of the bill of particulars, dated April 23, 1932, has to do with two bonds sold by the stock brokerage house of the Steffen-Kleinhen Company of Davenport, Iowa, to Pentis. This sale was negotiated early in April, 1932, and the bonds were personally delivered to Pentis in the office of Noyes & Co. the latter part of the month by Kleinhen. At the time a check of Noyes & Co. for $1089.18 was given to him in payment. On the same day Pentis, as village treasurer, drew a check against the special assessment fund for $1968.95, payable to the Central Republic Bank and Trust Company. With this he purchased a cashier's check for that amount payable to Noyes & Co. His trading account with the company reflects the Kleinhen check as a debit and the cashier's check as a credit. On this transaction Pentis is charged with embezzling $897.77.

The fourth item which Pentis is charged to have embezzled involved two bonds having a total face value of

$1852.74, belonging to a bank in Davenport. The sale of these bonds to Pentis was negotiated by Kleinhen, of the Steffen-Kleinhen Company, in June, 1932, at a total price of $1220. On June 28 the bonds were mailed to Noyes & Co. for the attention of Pentis. He was instructed at the same time to deposit the price thereof with the Central Republic Trust and Savings Bank to the credit of the Davenport bank. These two bonds were subsequently redeemed in installments. On June 29, the day the bonds were received by Pentis, he drew a check on the special assessment fund, payable to the Central Republic Bank and Trust Company, for $1520. With this check three cashier's checks were purchased by him—one to himself for $1400, another to himself for $100 and the third for $20 in favor of the Steffen-Kleinhen Company. The $1400 check was given to the bank to pay the Steffen-Kleinhen Company for the two bonds. The $20 was sent to the same company by Pentis, and he used the $100 for his own purposes. The record does not disclose what was done with the remaining $200 of the $1400. On August 4, as treasurer of the village, Pentis drew a check against the special assessment fund for $332.74, which represented the remaining amount of principal and interest necessary to redeem the two bonds. This check was drawn to the order of the Central Republic Bank and Trust Company and used to purchase two cashier's checks which were turned over to Noyes & Co., and Pentis received credit therefor in his trading account. The difference between the cost of the bonds and the amount it took to redeem them was $632.74.

These are the events upon which the People rely to make out a case against Pentis. The testimony of the cashier of Noyes & Co. makes it apparent that none of the special assessment bonds in question passed through the hands of the firm, and the ledger sheets of the firm showing Pentis' account during the time covered by the transactions confirm this. This account does show, however,

that Pentis used his credit with that firm to procure money therefrom through the medium of checks given to him, which in turn he used in paying for the bonds, with the exception of the last transaction. It is clear, in view of the evidence, that the solution of the point made by Pentis does not rest upon whether the property in the bonds became vested in him when his offers therefor were accepted or when the bonds were paid for. In the determination of this question we attach no importance to his obtaining the purchase price from Noyes & Co. on his credit, and afterwards re-paying them, on the first three transactions. The evidence can only be construed one way: The defendant used money from the special assessment fund to retire the bonds, and he relied upon that fund as the source of his profits. His direct appropriation of money out of this source to make payment in the last transaction instead of using his trading account with Noyes & Co. discloses this ultimate reliance upon the fund for the profit in the other transactions.

Under the bill of particulars the charge and proof against the defendant were limited to embezzlement of the profits derived from his use of money belonging to the village. This is shown by the fact that in each instance the amount stated in the bill of particulars coincides with the amount of the profits in the particular transaction. Those profits never belonged to the village, were never in its possession and were never entrusted by it to the defendant. The elements of embezzlement, as that crime is defined, (*People* v. *Parker,* 355 Ill. 258; *People* v. *Davis,* 269 id. 256; *People* v. *Ervin,* 342 id. 421;) are lacking, and those profits were not the subject of embezzlement.

The judgment of the criminal court of Cook county is therefore reversed.

*Judgment reversed.*

Mr. JUSTICE WILSON, dissenting.