Estate of Jessie E. Bond, Franklin P. Bond, Executor v. Commissioner.
Estate of Bond v. Commissioner
Docket No. 218-64.
United States Tax Court
T.C. Memo 1966-21; 1966 Tax Ct. Memo LEXIS 260; 25 T.C.M. (CCH) 115; T.C.M. (RIA) 66021; January 26, 1966
*260 Held: (1) Gifts made in 1959, 1960, and 1961 by decedent, who died in 1961, were not made in contemplation of death; (2) Value of decedent's residence at time of death was $20,000. Robert J. Richards, Jr., for the petitioner. Frederick A. Griffen, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The petitioner is the Estate of Jessie E. Bond, deceased. The respondent determined a deficiency in estate tax in the amount of $6,953.40. Two issues are presented for decision: (1) Whether certain cash gifts made by decedent to her children within three years prior to her death were made in contemplation of death within the meaning of section 2035 of the Internal Revenue Code of 1954; and (2) whether the value of decedent's residence *261 at the time of death was $18,000, as reported on the estate tax return, or $20,000, as determined by respondent. Some of the facts are stipulated. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated by this reference. Jessie E. Bond was born January 5, 1883, and died on February 4, 1961, at the age of 78. She was survived by three children: Franklin Pierce Bond, Marguerite (Bond) Stafford, and Cynthia (Bond) Joyce, then of the approximate ages of 50, 40, and 48, respectively. The decedent left a will dated April 6, 1956. After a specific bequest, it left the remainder of the estate in equal shares to her three children. Her son Franklin P. Bond is the duly appointed and qualified executor of the estate. The estate tax return was filed April 26, 1961, with the district director of internal revenue at Portsmouth, New Hampshire. During her lifetime Jessie E. Bond made gifts of securities or cash to each of her three children named above in the following amounts: December 6, 1955
$8,844.33
February 21, 1956
6,650.00
May 1, 1959
3,000.00
January 26, 1960
3,000.00
November 17, 1960
3,000.00
January 26, 1961
3,000.00
*262 The transfers of funds made on January 26, 1961, were made by Franklin pursuant to instructions given by the decedent in December 1960. A gift tax return was filed by Franklin for decedent covering the gifts made in 1960. During the period from May 1, 1959, to January 24, 1961, Jessie E. Bond lived alone in her eight-room house in Rochester, New Hampshire, which she kept and maintained without assistance of employed help. She did her own shopping until her last illness. The house was a frame structure of two stories with one bathroom. Franklin P. Bond is president of the Wolfeboro National Bank, Wolfeboro, New Hampshire. He is married and has no children. In 1955 and 1956 he was an assistant cashier of the bank and later was executive vice president thereof. At the time of the decedent's gifts to him in 1955 and 1956 his salary was low and the gifts were helpful. In 1959 and 1960 he was buying a farm to live on and the gifts were helpful to him in acquiring it. At that time his earnings were approximately $11,000 to $12,000 per year. He transferred funds, in accordance with instructions from the decedent, from her account to his account and those of Marguerite and Cynthia. *263 The husband of Marguerite was in the undertaking business in 1959 and 1960. He also operated a country store in Stowe, Vermont. The Staffords had one son who was in the University of Michigan between 1953 and 1960 and who married while in college. The gifts from the decedent in 1955 and 1956 and also in 1959 and 1960 were helpful to them in assisting their son during these years. The Staffords' income tax returns reported taxable income of $15,437.84 in 1959 and $19,051.97 in 1960. The husband of Cynthia was in 1959 and 1960 an airplane pilot for the National Life Insurance Company of Vermont. The Joyces had one son who was 14 years old in 1959. The gifts they received from the decedent in 1955 and 1956 were helpful to them as Cynthia's husband had been unemployed for some time. The gifts they received from the decedent in 1959 and 1960 were given in order to enable them to send their son to college and were later so used. They would have been unable to do this without such gifts. The Joyces' income in 1959 and 1960 was approximately $9,800 per year. From 1947 decedent was under treatment by a physician from time to time for arthritis, hypertension, and arteriosclerosis. The doctor *264 prescribed digitalis in daily dosages as early as 1950 and prescribed paratrate in 1953. She visited the physician twice in 1957, once in 1958, and once in 1960. Her husband and her brother had died from heart ailments. In June 1960 the doctor found her condition deteriorated, but not alarmingly. He increased one medication because of coronary insufficiency. He did not see the patient again until January 1961. On January 24, 1961, the doctor was called and found her in circulatory failure, and critically ill. She was admitted to the hospital and placed in an oxygen tent. The cause of death on February 4 was myocardial failure due to arteriosclerotic heart disease and generalized arteriosclerosis. During her lifetime the decedent was cheerful and did not complain about her health. She did not indicate to her physician an anticipation of death. She expressed to her son an interest in the welfare and happiness of her children and a desire to help them financially. The estate tax return reported the value of decedent's residence as $18,000. It listed the transfers made by decedent in the years 1955 to 1961 and stated the motive for such gifts as "affection for children." It reported *265 a gross estate of $85,436.67, taxable estate of $18,544.72, and tax of $1,439.92. Respondent determined that the fair market value of decedent's residence was $20,000 at the time of her death and that the transfers of cash in 1959, 1960, and 1961 aggregating $36,000 were made in contemplation of death. The transfers of cash made in 1959, 1960, and 1961 were not made in contemplation of death. The fair market value of decedent's residence at the time of death was $20,000. Opinion Respondent contends that the cash distributions made by the decedent in 1959, 1960, and 1961 were made in contemplation of death and are includable in the gross estate by reason of section 2035, Internal Revenue Code of 1954. [1] Since these distributions were made within three years before the date of death, they are deemed, under subsection (b), to have been made in contemplation of death unless shown to the contrary. *266 Both parties cite United States v. Wells, 283 U.S. 102 (1931). In that case the governing principles were stated (pp. 117-119): As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be "contemplated," that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. * * * It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. *267 It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand." If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is, not only the desire to be relieved *268 of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death. Respondent points to the facts that decedent suffered from a heart condition, arthritis, high blood pressure, and hypertension and had been treated for such conditions since 1947. The cause of death was heart failure. Decedent was aware of the state of her health, and was 76 years old at the time of the first of these transfers. She was taking daily doses of digitalis, a drug used to support the heart muscle, as well as taking paratrate, a drug used to dilate the coronary vessels of the heart to increase the flow of blood to the heart muscle. She knew that her brother and her husband had died from heart ailments. The transfers were made in equal amounts to her children, and she had named them as equal heirs in her will. *269 At the time of the transfer in January 1961 she was critically ill. These factors, says respondent, show that the transfers were motivated by the thought of death and made as a substitute for testamentary dispositions of her property. The estate contends that the motives which impelled decedent to make these transfers were associated with life. In 1955 and 1956 the decedent had given securities to her children and the gifts fulfilled needs of all of them at that time. Franklin was a minor officer of the bank and on a low salary; Cynthia's husband had been unemployed; and Marguerite's son was attending college. At the time of the gifts in 1959 and 1960 Marguerite's son was finishing college, had married, and was in need of assistance; Cynthia's son was preparing for college and without such gifts the Joyces would have been unable to provide for his college education; and Franklin, then executive vice president and cashier of the bank at Wolfeboro, was trying to buy a farm and the gifts helped him in acquiring it. The testimony of all the children is to the effect that the decedent was cheerful and optimistic, never complained of her health, gave no indication of thoughts of death, *270 and was always desirous of helping them or enabling them to help their children. The transfer on January 26, 1961, was made by Franklin pursuant to instructions given by decedent in December 1960 which he had not carried out earlier. These transfers were motivated by the same purposes as the others in 1959 and 1960. The doctor testified that the decedent at no time indicated to him an anticipation of death. She did not seek medical attention often. His records show two visits in 1957, one in 1958, none in 1959, and only one in 1960, in June. At that time her condition had deteriorated, but not alarmingly. One medication was increased then because of the coronary insufficiency. None of this evidence tends to show anticipation of death as a motive for the transfers. The decedent lived alone, cared for her house, and did her own shopping. Her son visited her two or three times a month, her daughters less frequently. She had enough money for her needs and could spare the sums given. She desired to help her children, and the gifts were in every case helpful. Her desire to be helpful to them was the compelling motive for the transfers. We hold that these transfers were not made in *271 contemplation of death. The respondent determined that the value of decedent's residence at the time of her death was $20,000. This figure is based upon an offer to purchase the house for that price admittedly received by the executor in 1962, and which was refused after consultation among the heirs. The estate's estimate of $18,000 as the value of the residence, the figure reported on the estate tax return, was based on an appraisal made by an independent appraiser at the request of the executor. The appraiser did not testify and his report was not offered in evidence. In this state of the record the presumption of correctness of the respondent's determination is not rebutted and we find that the value was $20,000. Decision will be entered under Rule 50. Footnotes
1. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *; but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death.↩