ESTATE OF MAX SHLENSKY, Deceased, BLANCHE SIEGEL, Co-Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Shlensky v. Commissioner
Docket No. 8843-74.
United States Tax Court
T.C. Memo 1977-148; 1977 Tax Ct. Memo LEXIS 295; 36 T.C.M. (CCH) 628; T.C.M. (RIA) 770148; May 16, 1977, Filed Warren E. King, for the petitioner. David P. Fuller and James F. Hanley, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $135,295.51 in petitioner's Federal estate tax. Other issues having been settled, the only ones remaining for decision are as follows: 1. What was the fair market value on September 7, 1970, the date of decedent's death, of the Morris Building of Joliet, an asset of decedent's wholly owned corporation? 2. Whether the estate is entitled to a deduction for a theft loss under section 2054 [1]/ as the result of certain activities of Harold Shlensky, decedent's brother and co-executor of decedent's estate. FINDINGS OF FACT 1. General
Decedent, Max Shlensky (hereinafter referred to as Max), died testate on September 7, 1970. Max's brother, Harold Shlensky *297 (hereinafter referred to as Harold) of Chicago, Illinois, and one of his sisters, Blanche Siegel (hereinafter referred to as Blanche) were appointed co-executors of his estate and filed the Federal estate tax return with the District Director, Internal Revenue Service, Chicago, Illinois, on December 7, 1971. At the time the petition was filed, Blanche was a legal resident of Detroit, Michigan. 2. The Morris Building Issue
When Max died, he owned all of the outstanding shares of Morris Building of Joliet, Inc. (hereinafter referred to as the corporation). The value of the corporation's assets (other than the Morris Building of Joliet (hereinafter the Morris Building) and leaseholds relating thereto) on the date of Max's death, as well as the amount of the corporation's liabilities, were as follows: Assets
Securities
$190,081.26
Cash
2,371.10
Loan rec. - H. Shlensky
5,000.00
$197,452.36
Liabilities
Debt due - Max Shlensky
$ 91,494.89
Mortgage
20,869.20
Accrued, Expenses (taxes)
20,099.06
Tenant's Security Deposit
2,000.00
$134,463.15
The Morris Building, one of the corporation's principal assets, was situated on real estate not owned *298 in fee by the corporation but, rather, was on a ground lease payable at the rate of $780 per month or $9,360 per year. On December 10, 1971, the Morris Building was sold for $130,000. There had been no material change in circumstances relating to the building between September 7, 1970, the date of Max's death, and December 10, 1971, the date of sale. Sometime prior to the date of sale, an investment group had offered $50,000 for the building, and such offer was rejected. Unverified and unaudited financial statements relating to the building for the period August 1970 through December 1971 disclosed $83,034 of receipts and $137,537.76 of disbursements, producing a negative figure of $54,503.76. The disbursements, however, included certain expenditures, such as mortgage principal payments, which were capital in nature. James E. Larkin (hereinafter Larkin), petitioner's expert witness, used these statements as the basis for his appraisal that the Morris Building had no economic value on the date of decedent's death. 3. The Theft Loss Issue
Because Blanche resided in Detroit, Michigan, and Harold was familiar with Max's business affairs, Harold, as co-executor, took primary *299 responsibility for management of the assets and business of Max's estate. However, differences of opinion concerning the administration of the estate and the interpretation and construction of the will arose between Harold and his four sisters (including Blanche), all of whom were beneficiaries under a residuary trust created under Max's will. As a result of these differences, a settlement agreement was executed on August 8, 1972. Under the terms of this settlement agreement, the residuary trust was to be terminated. Harold was to pay $41,000 to each of his four sisters (the remaining beneficiaries), and they, in turn, would assign him their interest in the estate. Additionally, Harold was to assume responsibility for the estate's tax liabilities and miscellaneous expenses of administration and was to assure that $50,000 was paid to certain charities. The estate's real estate was to be quitclaimed to Harold's nominee and the estate's assets distributed to Harold in his own right. Harold represented in the agreement that the value of the estate's assets was $265,118.97. On August 16, 1972, Harold petitioned the probate court for approval of the settlement agreement of August 8, 1972. *300 In granting its approval, the probate court, in its order of August 25, 1972, recited in part: * * * said Settlement Agreement * * * provides for payment and satisfaction to the beneficiaries of the value of their stipulated participatory interests in the residue * * * On August 21, 1972 and August 22, 1972, Harold withdrew $50,000 and $114,439.94, respectively, from the estate's checking account.He used these funds to pay the other beneficiaries, his sisters, $41,000 each as provided for in the settlement agreement of August 8, 1972. On March 15, 1973, Harold and his four sisters entered into a second agreement. Among other recitals, this agreement stated that certain representations and warranties made with respect to the estate's assets had induced the sisters to assign their interests to Harold under the August 8, 1972, settlement agreement and that such representations and warranties "contained material and significant understatements of numbers, amounts and values." The amendatory agreement further stated that while the understatements were "in all probability inadvertently made," they were misleading. The parties then agreed to settle their differences by reaffirming *301 the prior settlement agreement and by Harold paying each of his sisters an additional sum of $25,000 and the attorney for three of his sisters the sum of $15,000.
Harold considered all of the estate's assets as his own as a result of the settlement agreement of August 8, 1972, and its subsequent modification under the March 15, 1973, agreement. Among the assets of the estate was the stock of Bankers Finance Company, a corporation in which Max and Harold each had a 50-percent interest. One of the assets of Bankers Finance Company was a checking account at the Central National Bank in Chicago, which as of August 31, 1970, had a balance of $77,914.30. On September 16, 1970, Harold, as president of Bankers Finance Company, opened a corporate checking account at the same bank designating the account "Bankers Finance Co. - Spl. Acct." and transferred the $77,914.30 to that account. Harold then made four withdrawals totaling $75,000 from that account, beginning on October 2, 1970, and ending on October 25, 1970, and deposited the same amount in his personal account at Central National Bank in Chicago.
On May 18, 1975, Harold filed with the probate court the estate's revised current *302 account for the period September 7, 1970 to February 28, 1975. On June 9, 1975, Blanche filed her objections to this account, reciting that an estate tax deficiency had been asserted by virtue of the issuance of the statutory notice of deficiency involved in the instant proceeding. She listed 117 objections, including allegations that Harold had wrongfully converted and failed to account for certain proceeds (one item of which was the net sale proceeds of the Morris Building), shares of stock, bonds, debentures, and notes (one of which was a $10,000 U.S. Treasury note).Finally, Blanche objected to 55 disbursements made by Harold during the period of administration of the estate including the withdrawals from the estate that Harold made to pay Blanche and her sisters the $41,000 each under their August 8, 1972, agreement. Believing he owned the entire estate, Harold refused to give a more complete accounting. On August 18, 1975, the probate court entered its order finding that Harold had converted the estate's assets and disbursed $172,433.40 of the estate's funds for his own use without lawful authority or order of the court. The order conformed with Blanche's objections in *303 all respects. OPINION 1. The Morris Building Issue
Section 2031(a) provides as follows: The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. For purposes of section 2031(a), "value" means "fair market value," i.e., "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. On its Federal estate tax return, petitioner showed the fair market value of Max's wholly owned corporation as $100,000 on the date of decedent's death. Respondent determined its value to be $181,541.49. The difference is attributable to the value the parties have assigned to one of the corporation's principal assets-- the Morris Building located in Joliet, Illinois. Respondent valued the Morris Building as of the date of decedent's death at $130,000, basing his appraisal on a sale of the building at that price approximately 15 months *304 after decedent's death. Ordinarily, the price set by a freely negotiated agreement made reasonably close to the valuation date is, in the absence of more reliable evidence, persuasive evidence of fair market value. Ambassador Apartments, Inc. v. Commissioner,50 T.C. 236, 244 (1968), affd. per curiam 406 F.2d 288 (2d Cir. 1969); Estate of Schroeder v. Commissioner,13 T.C. 259, 263 (1949). The parties stipulated that there had been no material change in the circumstances relating to the building between Max's death on September 7, 1970, and the date of such sale on December 10, 1971. We think the sale price of the building, therefore, must be given great weight. Further, petitioner presented no evidence to show that the sale was not one between a willing seller and a willing buyer, both in possession of all the material facts. Harold, one of the co-executors, was involved in the sale, but he offered no testimony that the buyer was uninformed or that real estate prices had advanced in the period between Max's death and the sale. Hence, we can find no basis in the record to justify a downward adjustment to the sale price of $130,000. *305 See Estate of Loewenstein v. Commissioner,17 T.C. 60, 63 (1951). Larkin, petitioner's expert witness, testified that the Morris Building had no fair economic value on the date of decedent's death since the building was losing money at that time. His opinion was based on some unaudited, unverified, and, to a large extent, unanalyzed statements reflecting receipts and disbursements relating to the building for the period August 1970 through December 1971. He took the figures in such statements at their face value without further inquiring as to whether some of the disbursements, for instance, represented capital expenditures rather than valid operating expenses. Larkin stated that he was aware of the 1971 sale of the Morris Building but did not consider it in arriving at his valuation. He merely conjectured that the price of $130,000 was "rather high." Finally, after testifying that the building had no value, he admitted that, prior to the date of sale, an investment group had offered $50,000 for the building, and such offer was rejected. We conclude that the infirmities in Larkin's testimony render his appraisal less indicative of the fair market value of *306 the property than the arm's-length sale price of $130,000. 2. The Theft Loss Issue
Section 2054 provides, in part, as follows: * * * the value of the taxable estate shall be determined by deducting from the value of the gross estate losses incurred during the settlement of estates arising from fires, storms, shipwrecks, or other casualties, or from theft, when such losses are not compensated for by insurance or otherwise.
While neither this section nor the applicable regulations define the term "theft," the section's language closely parallels section 165(c)(3), [2]/ and under that section the issue as to whether a loss arose from theft is to be determined under the applicable State law. Weingarten v. Commissioner,38 T.C. 75, 78 (1962). The leading income tax case of Edwards v. Bromberg,232 F.2d 107, 110-111 (5th Cir. 1956), broadly defines "theft" as used in section 165(c)(3) as follows: * * * the word "theft" is not like "larceny," a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property *307 to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile. * * * [It] has been long and well established that whether a loss from theft occurs within the purview of Section 23(e)(3) [the predecessor to section 165(c)(3)] of the Internal Revenue Code of 1939 and the corresponding provisions of prior acts, depends upon the law of the jurisdiction where it was sustained and that the exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft. [Fn. ref. omitted.] *308 The parties agree that theft includes embezzlement and that the precise issue is whether Harold embezzled funds from the estate. The Illinois Criminal Code of 1961, Ill. Ann. Stat. ch. 38, sec. 16-1 (Smith-Hurd 1970) [3]/ defines "theft" as follows: A person commits theft when he knowingly: (a) Obtains or exerts unauthorized control over property of the owner; or (b) Obtains by deception control over property of the owner; * * * and (1) Intends to deprive the owner permanently of the use or benefit of the property; or (2) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or (3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner permanently of such use or benefit. *309 Generally, under Illinois law, embezzlement consists of the accused's conversion of another's funds in his possession in a fiduciary capacity, and the crime is complete when there is a fraudulent conversion without the owner's consent. People v. Riggins,13 Ill.2d 134, 148 N.E.2d 450, 452 (1958); People v. Schnepp,362 Ill. 495, 200 N.E. 338, 339-340 (1936); People v. Mooney,303 Ill. 469, 135 N.E. 776, 777 (1922). Embezzlement involves secrecy and concealment of conversion, and the absence of proof thereof tends to negative the requisite felonious intent. People v. Parker,355 Ill. 258, 189 N.E. 352, 363 (1934); People v. Davis,269 Ill. 256, 110 N.E. 9, 14-16 (1915); McElroy v. People,202 Ill. 473, 66 N.E. 1058, 1060 (1903). The mere proof of the receipt of funds and the failure to account therefor is not sufficient, in itself, to show embezzlement by an agent. People v. Parker,supra at 363; People v. Davis,supra at 13; People v. Ervin,342 Ill. 421, 174 N.E. 529, 531 (1930). Criminal intent is an essential element of embezzlement. People *310 v. Riggins, supra at 452; People v. Clark,9 Ill.2d 46, 137 N.E.2d 54, 59 (1956), cert. denied 352 U.S. 1002 (1957).
To support its allegation that Harold embezzled the estate's funds, petitioner relies mainly on fragmentary and confusing evidence elicited at trial and on the probate court's order of August 18, 1975, stating that Harold acted without the lawful authority of that court and converted to his own use assets and funds of the estate. We do not think this evidence is sufficient. Initially, we do not think the record before us supports a finding that Harold intended to convert his sisters' funds to his own use. As a co-executor, Harold had substantial control over the assets in the estate from the date of Max's death. By virtue of the August 8, 1972, and March 15, 1973, agreements, with his sisters, Harold became the sole beneficiary of the estate. While these agreements are cast in terms of a purchase and sale, they were designed to give the sisters their fair share of the value of the estate. Thereafter, Harold believed in good faith that he was the sole owner of the estate's assets, and such belief was based on reasonable grounds. *311 As a result of those agreements he became entitled to all the assets when they were distributed. In these circumstances, Harold's claim, whether meritorious or illfounded, completely negatives the idea that he "converted the property to his own use with the felonious intent to deprive the [owners] of the property or its use." People v. Parker,supra at 363. Petitioner argues that Harold's felonious intentions were evidenced by the March 15, 1973, agreement to pay three of his sisters and their attorney additional sums. However, that agreement expressly states that Harold's understatements of assets or their value which had formed the basis of the original August 8, 1972, agreement were "in all probability inadvertently made." In an individual capacity, Blanche signed this agreement and is presumed to have known its contents. At trial petitioner sprinkled the record with examples of Harold's alleged felonious activities, none of which constituted embezzlement. Petitioner first cites two checks which Harold wrote to himself on the estate's bank account. However, these withdrawals, one in the amount of $50,000 on August 21, 1972, and the other in the amount of $114,439.94 *312 on August 22, 1972, were used to pay the other beneficiaries, his sisters, for their shares in the residue of decedent's estate as provided for in the August 8, 1972, agreement. Although it may have been improper to use estate funds to make such payments without obtaining an order of the probate court, we see no element of secrecy or concealment in Harold's actions which would tend to show embezzlement. Petitioner's next example of "theft" is Harold's transfer of $77,914.30 to his own personal account at Central National Bank in Chicago. These funds were originally held in a checking account in the same bank under the name of Bankers Finance Company, a corporation in which Max and Harold each had a 50-percent interest.If these were estate funds, the mere depositing by Harold, an executor of the estate, to his own private account does not prove that he was guilty of embezzlement. See People v. Davis,supra at 14. But these were the corporation's funds and, as such, their transfer cannot form a basis for a claim of theft from the estate. Moreover, the transfer of funds, standing alone, does not constitute theft from the corporation. Petitioner next contends that Harold *313 failed to account to the probate court for numerous items, among the largest of which were net proceeds in the amount of $65,317.81 [4]/ from the sale of the Morris Building owned by one of Max's corporations and a $10,000 U.S. Treasury note. Petitioner provided no specific proof concerning these items individually but rather bases its allegation of theft on Harold's failure to account. Although Harold may have breached a statutory duty to account for these assets (or the proceeds from their sale) thereby possibly subjecting himself to liability for mismanagement [5]/ of the estate, the failure or refusal to so account does not in and of itself constitute embezzlement. People v. Parker,supra at 363; People v. Davis,supra at 13; People v. Ervin,supra at 531. *314 Petitioner's ultimate basis for its claim of theft rests on the probate court's finding that Harold had wrongfully appropriated estate assets in the total amount of $739,535.77. First there is no credible evidence to show that the probate proceeding was adversary in nature. To the contrary, the record shows that Harold refused to give an accounting to the probate court except to the extent of his current revised account filed May 18, 1975. Blanche, as co-executor, filed objections to that account and such objections were summarily sustained and parroted in the probate court's order. Second, it appears that the order is full of inaccuracies. For instance, Blanche objected to 55 disbursements made by Harold, totaling $258,866.63. The order found that Harold made the 55 disbursements to himself without the court's permission, lists those disbursements, then finds that he converted $172,433.40 without identifying the particular items which make up this latter figure. Neither the record nor the order itself explains this discrepancy. As another example of the inaccuracies inherent in the order, a "$10,000 U.S. Treasury note plus interest" is valued at $1,060.94. Third, petitioner *315 on brief steadfastly maintains that the estate's loss amounted to $739,535.77, such figure being approximately $500,000 more than the figure Harold represented to be the total assets of the estate at the time the parties entered into the August 8, 1972, agreement. However, at trial of the instant case, petitioner's counsel was requested to identify which of the 55 disbursements listed in the order were converted.He identified some, conceded many were not converted, and stated that he did not have the "slightest idea" as to one. Hence, we are not convinced of the reliability or accuracy of that order. Taking all of the evidence into consideration, we hold that petitioner's claimed loss deduction must be denied. While the estate may have been mismanaged, the evidence in this proceeding does not show that Harold committed theft, within the meaning of section 2054, in respect of its assets. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect at the time of decedent's death, unless otherwise noted.
2. / SEC. 165. LOSSES. (c) Limitation on Losses of Individuals.-- In the case of an individual, the deduction under subsection (a) shall be limited to-- (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
3. /↩ In 1961, the Illinois General Assembly repealed the provisions of the Criminal Code dealing with embezzlement and enacted the Criminal Code of 1961, effective Jan. 1, 1962, under which the crime of embezzlement is now theft. The gravamen of the crime fundamentally remained the same. One clarification, found in Ill. Ann. Stat. ch. 38, sec. 16-4(a) (Smith-Hurd 1970), removed any doubt that a co-owner, such as a partner, joint tenant, or tenant in common, could commit the crime of theft. See Committee Comments to Ill. Ann. Stat. ch. 38, sec. 16-4(a) (Smith-Hurd 1970).
4. /↩ On Dec. 10, 1971, the Morris Building was sold for $130,000. After certain prorations for taxes and rents and certain commissions and expenses, the net amount due the corporation was $65,317.81. Petitioner's Requested Findings of Fact erroneously picked this figure up as $65,202.19. 5. Ill. Ann. Stat. ch. 3, sec. 306 (Smith-Hurd 1961), provides the remedy for mismanagement of estate assets by an executor as follows: An executor, administrator, or administrator to collect and the surety on his bond are liable to a successor executor, administrator, or administrator to collect, to a co-executor or co-administrator, or to any person aggrieved thereby for any mismanagement of the estate committed to his care and the successor executor, administrator, or administrator to collect or the coexecutor or co-administrator, or the person so aggrieved, may institute and maintain an action against the executor, administrator, or administrator to collect and the surety on his bond for all money and property which have come into his possession and are withheld or may have been wasted, embezzled or misapplied and no satisfaction made therefor.↩