The **FIRST NATIONAL BANK OF KENOSHA, as Personal Representative of the Estate of Ethel M. Rudy, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 84–1679.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1985.

Decided June 7, 1985.

Thomas G. Ragatz, Foley & Lardner, Madison, Wis., for plaintiff-appellant.

Laurie A. Snyder, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before WOOD, ESCHBACH and POSNER, Circuit Judges.

ESCHBACH, Circuit Judge.

In this action for a refund of estate taxes, the First National Bank of Kenosha, as representative of the estate of Ethel M. Rudy ("the estate") argues that trial error mandates reversal of a jury verdict assessing the value of a farm at $1,100,000. We affirm.

I.

Mrs. Ethel Rudy died on March 13, 1978, leaving a 192.6 acre farm located in the Town of Pleasant Prairie, Wisconsin, just outside the city limits of Kenosha. Mrs. Rudy's estate filed a federal estate tax

return in which it valued the property at $405,000. The Internal Revenue Service subsequently determined the value of the property was $1,567,000, and assessed a deficiency, which the estate paid. The estate filed a timely claim for a refund with the IRS, *see* 26 U.S.C. § 7422(a), and, when no action was taken on the claim, brought this action for a refund in the district court pursuant to 28 U.S.C. § 1346(a).

Before the jury trial began, the estate moved in limine to exclude evidence of events occurring after the date of Mrs. Rudy's death. Specifically, the estate sought to exclude evidence of the existence and contents of an Agreement of Limited Partnership executed between Dayton Development Company and Mrs. Rudy's heirs in December 1974, 21 months after Mrs. Rudy's death.

The facts surrounding the agreement were not disputed, although some of the terms of the agreement were. Dayton first contacted the estate some 15 months after Mrs. Rudy's death and discussions began regarding the sale and development of the farm. These discussions culminated in the agreement. The purpose of the agreement was to develop and operate a major regional shopping center, and it contained the following terms:

1. Dayton had the right to dissolve the partnership at any time prior to July 31, 1983, without further liability to the heirs;
2. If the partnership were not dissolved, the heirs would receive a total of $1,000,-000 for the farm, payable in four unequal installments.

The heirs received the first installment, $25,000, in January 1981, but Dayton dissolved the partnership in December 1981 and no further payments were made. As reasons for dissolving the partnership, Dayton cited the "changed economic situation" and the "lack of department store

interest" due to a cutback in department store expansion plans.

The district court denied the motion in limine and the agreement was introduced into evidence over the estate's renewed objection. The jury was apprised of the facts surrounding the agreement, including that the partnership was dissolved and that the present value of the agreement at the valuation date (i.e., the date of Mrs. Rudy's death) was only $643,000. In addition, the estate and the IRS each presented a valuation expert. The estate's expert testified that the property was worth no more than $800,000 on the date of death; the IRS's expert placed the value at $1,415,000. The jury found that the fair market value of the Rudy farm on March 13, 1978, was $1,100,000.

II.

**A. Admission of the Partnership Agreement**

The estate contends that the district court erred in admitting the partnership agreement as evidence of the farm's value, arguing that admission was barred under a rule forbidding consideration of subsequent events to determine value on the date of death. Analysis of the estate's argument requires us to consider the parameters and purpose of this rule.

■ Under the Internal Revenue Code, the value of the decedent's gross estate is determined by the value of all property in the estate at the time of death. 26 U.S.C. § 2031(a).[1] Value is fair market value, defined as what a willing buyer would have paid a willing seller, both having reasonable knowledge of the relevant facts. 26 C.F.R. § 20.2031–1(b). Because property is valued as of the date of death, the only relevant facts are those that this hypothetical buyer and seller could reasonably have

---

1. The Code provides, for estate tax purposes, for alternate valuation dates. The taxpayer may choose, as did the estate here, to determine the value of the property on the date of the decedent's death, 26 U.S.C. § 2031(a); 26 C.F.R. § 20.2031–1(b), or the taxpayer can choose the alternate valuation date, now six months after the date of death. 26 U.S.C. § 2032; 26 C.F.R. § 20.2032–1. If the alternate valuation date is chosen, all property in the estate must be valued as of that later date.

been expected to know at that time. Thus, a rule has developed that subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation—in estate tax cases, the date of death. *See, e.g., Ithaca Trust Co. v. United States,* 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); *Estate of Van Horne v. Commissioner,* 720 F.2d 1114, 1116 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2364, 80 L.Ed.2d 835 (1984); *Guggenheim v. Helvering,* 117 F.2d 469 (2d Cir.), *cert. denied,* 314 U.S. 621, 62 S.Ct. 66, 86 L.Ed. 499 (1941); *Couzens v. Commissioner,* 11 B.T.A. 1040, 1165 (1928); *see also* C. Lowndes, R. Kramer & J. McCord, Federal Estate and Gift Tax 515 (1974) [hereinafter cited as Federal Estate and Gift Tax].

As explained above, the property in the decedent's estate is evaluated by determining what a willing buyer would give for it on the date of death. Information that the hypothetical willing buyer could not have known is obviously irrelevant to this calculation. Suppose that sometime after Mrs. Rudy had died, her executor had discovered oil on the farm—oil that no one had suspected existed. The existence of oil on the land would increase the value of the property tremendously, but it cannot be supposed that a willing buyer on the date of Mrs. Rudy's death would have considered the presence of oil in calculating how much to offer for the property. The discovery of oil is the kind of "subsequent event" that the rule discussed above makes inadmissible, for it is beyond the contemplation of the parties on the relevant valuation date. *See, e.g., Guggenheim, supra,* 117 F.2d at 472 (fact that hopes upon which stock prices were based later proved unfounded irrelevant to fair market value of stock on date of decedent's death).

On the other hand, courts have not been reluctant to admit evidence of actual sales prices received for property after the date of death, so long as the sale occurred within a reasonable time after death and no intervening events drastically changed the value of the property. *See, e.g., Rubber Research, Inc. v. Commissioner,* 422 F.2d 1402 (8th Cir.1970) (sale of stock after valuation date admitted to show fair market value on valuation date); *Fitts' Estate v. Commissioner,* 237 F.2d 729 (8th Cir.1956) (same); *Estate of Keller v. Commissioner,* 41 T.C.M. (CCH) 628 (1980) (price received for farm 6 months after death); *Estate of Schlensky v. Commissioner,* 36 T.C.M. (CCH) 628 (1977) (price received for building 15 months after death); *Estate of Ballas v. Commissioner,* 24 T.C.M. (CCH) 506 (1975) (price received for building 7 months after death); *Estate of Smith v. Commissioner,* 57 T.C. 650 (1972) (price received for sculptures after death of artist), *aff'd,* 510 F.2d 479 (2d Cir.1975); *Estate of Bond v. Commissioner,* 25 T.C.M. (CCH) 115 (1966) (price received for house one year after death). Moreover, evidence of actual price received for property in the estate after the date of death is generally admitted without any discussion of the rule against admission of post-valuation date events.

This seeming inconsistency is explained by looking to the purposes of the rule. The rule against admission of subsequent events is, simply stated, a rule of relevance. In a valuation case, the question to be asked of any proffered evidence is whether the admission of the evidence would make more or less probable the proposition that the property had a certain fair market value on a given date (here, the date of death). Under this traditional definition of relevance, evidence of most subsequent events would be excluded. For instance, if the proposition advanced is that a farm had a fair market value of $800,000 on March 13, the fact that oil was unexpectedly discovered on June 13 (causing the fair market value of the property to skyrocket) makes the proposition advanced no more or less likely. However, the fact that someone under no compulsion to buy and with knowledge of the relevant facts bought the property on June 13 for $1,000,000 is relevant, for it makes the proposition advanced (i.e., that the fair market value on March 13 was $800,000) less likely.

■ The limited partnership agreement did not evidence a completed sale. It could best be characterized as an option to purchase the property and, in fact, the option was never exercised. We think, though, that these facts properly go to weight rather than admissibility. There is no reason to suppose that Dayton was unaware of the relevant facts when it entered the agreement, nor does the estate argue that the amount proposed in the agreement was inflated by considerations having nothing to do with the fair market value of the property at the date of death. The estate argues that the fact that Dayton never exercised its option shows that its initial estimate of the value of the property was incorrect. That may be true, and the jury was certainly informed of that possibility. It is just as likely that Dayton structured the agreement as an option to protect itself against the possibility that the economy would take a downturn (the reason cited by Dayton for abandoning the project), and agreed to a price that reflected what it believed the fair market value of the property was, barring such a downturn. All of this goes to weight, however, and not to admissibility.

Nothing about the property had changed between the date of Mrs. Rudy's death and the date the partnership agreement was executed. The agreement was therefore relevant as some (though not conclusive) evidence of the fair market value of the property at the date of Mrs. Rudy's death.

The estate argues that the probative value of the agreement was outweighed by its prejudicial effect, so that the agreement should have been excluded under Fed.R. Evid. 403. While there is some doubt in the record that the estate properly raised this objection below, we believe it is without merit. The estate presented to the jury all of the reasons why the option's weight as evidence of the fair market value of the property on March 13, 1978, should be discounted. In fact, the estate presented evidence that the present value of the option (should it have been exercised) as of March 13, 1978, was only $643,702—and that evidence supported the estate's, not the government's, valuation of the property.

Accordingly, we find that on the facts of this case, the district court did not err in admitting the partnership agreement.

**B. Admission of Evidence of Sale of Racine Property**

■ The government's expert witness testified that his opinion that the highest and best use of a portion of the Rudy property was for development as a shopping center was supported by the facts surrounding the development of a shopping center on similar property in nearby Racine, Wisconsin. Because the expert testified that he did not rely on information about the Racine shopping center in his initial appraisal of the Rudy property, the estate argues that the testimony concerning the center was inadmissible as hearsay.

The estate relies on Fed.R.Evid. 703, which allows an expert to base his opinion on information of a "type reasonably relied upon by experts in the particular field" without regard to whether the underlying information is itself independently admissible. The rule was intended to obviate objections to expert opinion testimony based on the inadmissibility of the data upon which that opinion was based. Although the estate reads the rule as creating a limited hearsay exception for the underlying data itself, the rule on its face says nothing about the admissibility of evidence, whether hearsay or not.

As an initial matter, we question the importance of the distinction pressed by the estate between information used as the "basis" of the opinion and information used as "support" for the opinion. Whether or not the Racine center was taken into account in the first instance, the expert testified that he evaluated the information before trial and that the Racine property was comparable to the Rudy property. He then explained the effect of the information on his appraisal. Thus, the estate's objection is merely that the information was not considered in preparing the initial, pretrial written evaluation; the information did,

however, underlie the opinion the expert expressed at trial.

More to the point, however, is that evidence of sales of comparable property is routinely admitted in cases involving the valuation of real estate, as both the government and the estate recognized at trial. "Generally, evidence of sales of comparable property is persuasive evidence of market value, either as direct proof or in support of an expert's opinion." *United States v. 1,129.75 Acres of Land,* 473 F.2d 996, 998 (8th Cir.1973); *United States v. 412.93 Acres of Land,* 455 F.2d 1242, 1247 (3d Cir.1972); *United States v. 1,053.27 Acres of Land,* 446 F.2d 1234 (10th Cir.1971); *United States v. Sowards,* 370 F.2d 87, 90 (10th Cir.1966). While the cases above-cited are condemnation cases, there is no doubt that comparable sales are used to value property for estate tax purposes, *see, e.g., Estate of Ballas v. Commissioner,* 34 T.C.M. (CCH) 560 (1975); Federal Estate and Gift Tax at 520–21, as the estate recognized here by offering such evidence itself. We therefore do not agree that the admission of evidence concerning the sale and development of the Racine property was error.

## C.  Other Arguments

The estate argues that the jury's verdict has no reasonable support in the record and so should be set aside. In support of its argument, the estate cites the testimony of local officials that there were many impediments to development of the property. The estate also asserts that there were deficiencies in the appraisal techniques of the government's expert witness (although its claim that the expert ignored adverse information is not supported by the record).

■ A jury verdict cannot be lightly set aside as long as there is a reasonable basis for the verdict in the record. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). Viewing the evidence in the light most favorable to the verdict, we find (as did the district court) that the jury's verdict is reasonably grounded in the evidence. *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 69, 78 S.Ct. 84 (1983). Here, the jury was presented (as is often the case) with widely divergent opinions about the fair market value of the Rudy farm. The jury apparently did not accept wholecloth the view of either of the experts, and arrived at its figure independently (very possibly, we suspect, by splitting the difference). As the district court found, there is sufficient evidence in the record to support a jury verdict that accepted the government's valuation of approximately $1.5 million. Thus, a verdict for $1.1 million cannot be said to have no reasonable basis in the record: such a verdict is within the range of evidence presented to the jury, and we presume that the jury performed its responsibilities faithfully.

■ Finally, the estate argues that the district judge employed the wrong standard in denying its motion for a new trial. A new trial should be granted when the verdict is against the clear weight of the evidence, *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940), and the grant or denial of a new trial is confided almost entirely to the discretion of the trial judge. *Allied Chemical Corp. v. Daiflon,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). We do not believe that the fact that the judge did not ritualistically recite the "clear weight of the evidence" standard alone warrants reversal in this case. While we are aware that consideration of a motion for a new trial is entrusted to the trial judge, it is clear to us, having reviewed the evidence, that the evidence does not overwhelmingly favor one of the parties. Although the trial judge stated that he found the evidence in favor of the estate more persuasive, he did not indicate in any way that he thought the verdict an injustice. We therefore do not believe that the fact that the trial judge did not expressly articulate the standard he applied means that he applied an erroneous standard.

## III.

For the reasons expressed above, the judgment of the district court is affirmed.