ESTATE OF EVELYN WENDT PATTISON, DECEASED, MARIE D. PATTISON, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Pattison v. Commissioner
Docket No. 26805-87
United States Tax Court
T.C. Memo 1990-428; 1990 Tax Ct. Memo LEXIS 445; 60 T.C.M. (CCH) 471; T.C.M. (RIA) 90428; August 8, 1990, Filed *445 Decision will be entered under Rule 155. George W. Connelly, Jr. and Victoria J. Sherlock, for the petitioner. Phillip A. Pillar, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 730,098 *446 in the decedent's Federal estate tax. After concessions, [1] the sole issue for decision is the fair market value of two parcels of unimproved land in Waller County, Texas, on the date of decedent's death. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated *447 herein by this reference. Evelyn Wendt Pattison (decedent) died a resident of Waller County, Texas, on May 7, 1983. Marie D. Pattison is the executrix of decedent's estate. At the time the petition in this case was filed, the executrix resided in Pattison, Texas. On June 15, 1984, the executrix filed decedent's Federal estate tax return. Decedent's reported gross estate included five parcels of real estate, valued in Schedule A of the estate tax return at $ 802,869. Of these five parcels, the two at issue, items 2 and 3 on the estate tax return, were valued in Schedule A at $ 34,402 and $ 672,600, respectively. [2] Item 2 represents decedent's interest in the surface estate of 197 acres in Waller County, Texas (the 197-acre tract), and item 3 represents decedent's interest in the surface estate of 480 acres in Waller County, Texas (the 480-acre tract). Located approximately 30 miles west of the Houston Central Business District, the subject area of these two tracts is often referred to as the "Katy, Brookshire and Waller area." The nature of the area is primarily agricultural and rural residential, known for its rice farming and cattle ranches. *448 The area is accessible from U.S. Highway 290 and Interstate Highway (Interstate) 10 which connect to the overall freeway system of Houston. The cities of Katy and Brookshire are located along Interstate 10, while the City of Pattison is situated to the north of Brookshire. For the most part, residents of these towns are employed by Houston-related business or industry. The balance of the neighborhood is rural in character. As Houston has expanded westward, scattered pockets of residential development have arisen. The 197-acre tract is rectangular in shape and is located along the east line of Clemons Switch Road. It consists of two adjoining tracts of land, but was appraised as one tract. [3] One portion contains approximately 144 acres of land; the other contains approximately 53 acres of land. The 53 acres are located along the south line of the 144-acre tract. The 480-acre tract is square shaped and is located along the south line of F. *449 M. 529 (also known as Freeman Road). As of the date of decedent's death, there was speculation that a proposed airport would be located in the vicinity of the 480-acre tract (between Katy and Brookshire); however, six other sites were being considered. Neither petitioner's nor respondent's expert considered the airport location to be a significant factor in valuing the 480-acre tract. Respondent determined that on the date of decedent's death the fair market value of the 197-acre tract was $ 443,250 and the fair market value of the 480-acre tract was $ 1,680,000. ULTIMATE FINDINGS OF FACT 1. On the date of decedent's death, the fair market value of the 197-acre tract was $ 2,250 per acre, or $ 443,250. 2. On the date of decedent's death, the fair market value of the 480-acre tract was $ 3,500 per acre, or $ 1,680,000. OPINION The parties disagree as to the appropriate highest and best use, and the fair market values of the 197-acre tract and the 480-acre tract. Respondent's expert opined that the fair market values on the date of decedent's death was $ 2,250 per acre for the 197-acre tract and $ 3,500 per acre for the 480-acre tract. By contrast, petitioner's expert *450 opined that the fair market values on the date of death was $ 1,900 per acre for the 197-acre tract and $ 2,500 per acre for the 480-acre tract. Petitioner has the burden of proving that the fair market values of the real estate at issue are less than those determined by respondent. Rule 142(a). Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner , 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975). The willing seller and buyer are hypothetical rather than specific individuals or entities. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). *451 The determination of value is to be made as of the valuation date (here, the date of death). Sec. 20.2031-1(b), Estate Tax Regs. Subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation -- in estate tax cases, the date of death. See, e.g., Ithaca Trust Co. v. United States, 279 U.S. 151 (1929). The highest and best use to which property can be put is a factor in determining fair market value. H. Rept. No. 94-1380, 1976-3 C.B. (Vol. 3) 735, 755. The "highest and best use" is defined as the most economic use which is reasonably probable. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 124 (3d ed. 1988). Petitioner and respondent each rely upon valuations prepared by their respective experts. Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine the fact in issue. See Fed. R. Evid. 702. The trier of fact must weigh such evidence in light of the demonstrated qualifications of the *452 expert and all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever in our best judgment is appropriate. Helvering v. National Grocery Co., 304U.S. 282 (1938). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938). We may also choose to accept the opinion of one expert in its entirety. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). We have compared the qualifications and experience of the parties' experts, Mr. McPherson for respondent and Mr. Stanley for petitioner, as well as the substance and reasoning of their reports and testimony. We agree with the opinions of respondent's expert. Valuations of Respondent's Expert
Respondent's expert *453 report was prepared by 0. F. "Frankie" McPherson, President of Dominy, Ford, McPherson & Teel, a Houston firm specializing in appraising real estate. Mr. McPherson has been involved in the real estate profession for approximately 21 years. He is eminently qualified as an appraiser, [4] having achieved the MAI designation of the American Institute of Real Estate Appraisers (the MAI designation is the most highly recognized appraisal designation within the appraisal community) 6 years ago, and holding the Senior Real Property Analyst designation of the Society of Real Estate Appraisers for 11 years. Approximately 20 to 25 percent of Mr. McPherson's work has been the appraisal of unimproved rural acreage, including many appraisals of property in the Waller County area. He has taught appraisal courses at San Jacinto Junior College and the Gulf Coast School of Real Estate, and is a member of the Texas Society of Farm and Ranch Managers and Appraisers. *454 We found respondent expert's report (the "McPherson Report") and his supplemental report (in letter form) generally useful and persuasive. [5] The McPherson Report concluded that the "highest and best use" of the 197-acre and 480-acre tracts was rural residential, and valued the properties using the "comparable sales" method, which involves gathering information on sales of property similar to the subject property, then making adjustments for various differences between the "comparables" and the property being appraised. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, affd. 687 F.2d 224 (7th Cir. 1982). The "comparable sales" method is a commonly accepted method of appraising real estate. Expert opinions based on the comparable sales method have been found probative by this Court on numerous occasions. See Estate of Stanton v. Commissioner, T.C. Memo. 1989-341; Estate of Harms v. Commissioner, T.C. Memo. 1981-320; Black v. Commissioner, T.C. Memo. 1968-247. *455 a. The 197-Acre Tract
In ascertaining the highest and best use of the 197-acre tract, the McPherson Report took various factors into consideration, such as the physical characteristics of the property including location, access, size, shape, topography, as well as the legal factors. Based upon these factors, the McPherson Report concludes that the highest and best use is rural residential (a "single family residential subdivision within a rural area that consists of larger type lots"). Mr. McPherson examined the Waller County Deed Records for recent sales within the competitive market area of the subject property and conducted interviews with area brokers. Adjustments were made, when necessary, for variances in characteristics that were found to influence value. These characteristics included adjustments for size, location, access, highest and best use, utilities, improvements, time, and date of sale. The adjusted sales prices of the sales comparables offered a value range for the subject property from which the final value estimate was taken. Taking the comparable sales into consideration in addition to other factors provided in the McPherson Report and the supplemental *456 report, McPherson arrived at a value for the subject property as $ 2,250 per acre, for a total of $ 443,250. We accept this amount as reasonable. b. The 480-Acre Tract
The major market influence at the valuation date of this tract was the western expansion of Houston. Successful residential development reached the vicinity immediately to the east of the 480-acre tract. Furthermore, as evidenced by the presence of the Peregrine Estates subdivision, directly across F.M. 529 from the subject property, residential development had already begun in the immediate neighborhood. The McPherson Report concludes that taking the physical characteristics of the property (including location, access, size, shape, topography) as well as the legal factors into consideration, the highest and best use of the 480-acre tract would be for rural residential. The residential subdivision potential was known at the date of decedent's death. Post-death sales were properly used to show the trend of appreciation in the market at the valuation date. (The use of post-death data is permissible as to relevant facts which the hypothetical buyer and seller would be expected to know at the date of death. *457 First National Bank of Kenosha v. United States, 763 F.2d 891 (7th Cir. 1985).) Mr. McPherson accounted for differences in location in adjusting comparable sales. Based on the highest and best use of the 480-acre tract as "rural residential," the proximity to major local highways is significant. The 480-acre tract was located along a major east-west thoroughfare (F.M. 529) and a short distance from a major north-south thoroughfare (F.M. 362). Based upon the comparable sales provided in the McPherson Report and the supplemental report, the continued likelihood of western expansion of Houston, and the direct access of F.M. 529 into Houston, the McPherson Report concluded that the value of the 480-acre tract on the valuation date was $ 3,500 per acre, or a total of $ 1,680,000. We agree with (and thus adopt) this valuation. Petitioner's Contentions
We will address several contentions made by petitioner with respect to the opinions of respondent's expert witness. First, petitioner argues that the McPherson Report was prepared in a rush or in an unsupervised manner. Such argument is unfounded since the firm had approximately two months to value five similar *458 properties located within the same area and Mr. McPherson made the final determination as to value. Second, petitioner argues that Mr. McPherson's approach was inferior to that of its expert, Mr. Stanley. With the exception of a few inconsequential errors, [6] the McPherson Report disclosed all pertinent information about the transactions on which it based its conclusions. Third, petitioner contends that Mr. McPherson did not adequately disclose adjustments made in the valuations. We reject this argument as contrary to the evidence before us. The McPherson Report properly accounted for differences in location in adjusting comparable sales. Petitioner's expert admitted errors in adjustments he made to comparable sales. And Mr. Stanley admitted at trial that, based *459 on the highest and best use of the property as "rural residential," the proximity to major local highways is significant. Fourth, petitioner suggests that there were factors which the McPherson Report ignored; yet, the significance of those factors is not quantified by petitioner's own expert. For example, the conveyance of mineral interests in comparable sales is an often-mentioned fact in petitioner's brief; however, its expert made no adjustments to any comparable sales for the presence or absence of mineral rights. Further, while Mr. Stanley testified as to the significance of school districts, no direct evidence of the actual impact of the districts on comparable sales was introduced. Finally, petitioner criticizes Mr. McPherson for using post-death comparable sales to establish a "trend." However, this rationale has been expressly sanctioned by this Court in certain circumstances. Estate of Nutter v. Commissioner, 44 T.C.M. 1127, 1129 n. 3, 51 P-H Memo T.C. par. 82,530 at 2399 n. 3. Clearly, sales after the valuation date may be used to corroborate the ultimate *460 determination of the value. Estate of Smith v. Commissioner, 57 T.C. 650, 659, n. 8 (1972), affd. 510 F.2d 479 (2d Cir. 1975). We have approved the use of sales as much as 15 months after the date of death in the analysis of comparable sales. Estate of Shlensky v. Commissioner, T.C. Memo. 1977-148. Valuations by Petitioner's Expert
Petitioner's expert reports were prepared by Robert Stanley of Stanley, Chapman & Company, a real estate appraisal firm in Houston. He has 17 to 18 years of experience in the real estate appraisal field. Mr. Stanley holds the designation of Senior Residential Appraiser for the Society of Real Estate Appraisers, and he is also a Senior Member of the American Society of Appraisers. At present, he is applying for a Senior Real Property Analyst designation. Mr. Stanley prepared one appraisal report covering 144 acres of the 197-acre tract at issue. At trial, he admitted that the additional 53 acres might have affected his opinion of value. The second report proposed a value for the 480-acre tract. Mr. Stanley used the "comparable sales" method in ascertaining his final valuations. Estate of Spruill v. Commissioner, supra. *461 He concluded that the highest and best use of both tracts was agricultural, on an interim basis, since both tracts were too far removed from the current growth pattern to be part of any near-term residential development. However, he was evasive at trial in describing this highest and best use of the two tracts at issue. Mr. Stanley was forced to admit on the stand that the 480-acre tract could not possibly be purchased at even $ 2,500 per acre and be economically utilized as a rice farm (its 1983 agricultural use). Trying to compensate for that error, he retreated to an agricultural use as an "interim" use. We note, however, that "highest and best use" is not equivalent to "interim use." We found Mr. Stanley's expert opinion both in his report and at trial to be less convincing then the McPherson Report. For instance, he failed to make adjustments for location and found the highest and best use of the property to be agricultural despite its then current low return of 1 percent. He overlooked the fact that a residential subdivision was across the street from the 480-acre tract. Further, no explanation was given as to how he arrived at the final valuation amounts ($ 1,900 per *462 acre for the 197-acre tract and $ 2,500 per acre for the 480-acre tract). Conclusions
The major influence in the market in which the two properties were located was the westward expansion of Houston. The likely development of the property at the valuation date was residential use in the relatively near future. The prices at which the comparable sales were trading could not support agricultural uses. Although the eventually approved location of the proposed Westside Airport may have dampened any future residential development, that factor did not exist in May 1983, nor could it have been forecast. Thus, it was properly disregarded by both experts. First National Bank of Kenosha v. United States, supra.
Petitioner has not carried its burden of proof. Its attacks on respondent's appraisal report do not serve to establish the correctness of the amounts reported in the estate tax return. Based upon our consideration of all the valuation evidence introduced through testimony and documentation, as reflected in our ultimate findings of fact, we find Mr. McPherson's appraisals to be reasonable and correct, and his amounts of $ 2,250 per acre ($ 443,250) *463 for the 197-acre tract and $ 3,500 per acre ($ 1,680,000) for the 480-acre tract to be the fair market values of the two parcels of land on the date of decedent's death. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Petitioner concedes that the property does not qualify for special use valuation pursuant to section 2032A. Respondent admits that petitioner is entitled to additional administration expenses, and agrees to allow such other sums as deductible upon adequate proof of the amount, purpose and deductibility. Finally, both parties agree that this Court does not have jurisdiction to determine whether petitioner qualifies for installment tax payment treatment under section 6166. All section references are to the Internal Revenue Code of 1954, as amended and in effect on the date of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner accepted the fair market values established by respondent's expert for items 1, 4, and 5.↩
3. Petitioner's expert appraised only 144 of the 197 acres.↩
4. Petitioner does not appear to challenge McPherson's qualifications as an expert, except for referring to his firm as being on the "list of approved IRS appraisers" in 1985 and his having worked for respondent "at least ten times."↩
5. In fact, the McPherson Report appraised all 5 parcels which appeared on the Federal estate tax return, while petitioner's expert report only valued a portion of the 197-acre tract and the entire 480-acre tract.↩
6. For example, petitioner makes an issue of the fact that Mr. McPherson described a trade as a "cash"sale. However, Mr. Stanley used the same sale and made no adjustments to the consideration, but used it as a comparable sale in his analysis.↩